HARDAWAY & PROWELL v. NATIONAL SURETY CO.

(Circuit Court of Appeals, Sixth Circuit.   January 19, 1907.   On Rehearing, March 9, 1907.)

No. 1,584.

1. UNITED STATES—PUBLIC WORKS—CONTRACTS—ASSIGNMENT—EFFECT.

Where, after the members of a firm had obtained a contract for the performance of public work for the United States, two of the members of the firm assigned their interest therein to the third, who agreed to assume all the debts of the firm and to prosecute the work at his own risk and for his own benefit. such assignment, while valid as between the parties, could not affect the rights of the United States, and operated only as an assumption by the assignee of the debts of the firm in consideration of the receipt of the benefits to be derived from the execution of the agreement.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 47, United States, § 54.]

2. SAME—CONTRACTORS' BONDS—SUBCONTRACTORS—SURETIES.

An assignee of a public contract partially completed, the same, so that there was $8,300 of the contract price held back by the United States to secure performance, when he was unable to complete the work. He then applied to plaintiffs for assistance, who agreed to superintend the construction of the work, to reorganize the labor force, and to furnish the necessary finances for the completion of the work, for 15 per cent. commission upon their gross outlay, whether for labor and materials or other expenses, and an assignment of all payments to become due from the government on the contract, and, if this should not be sufficient, they should also have the right to use the $8,300 already earned. The contract also provided that the work should be completed on the terms and stipulations recited, one of which was that plaintiffs were to use the contractor's plant and quarry free of expense, and that only the surplus of the $8,300 fund was to be paid to the contractor in the event the fund proved more than sufficient to repay plaintiffs for every kind of disbursement, together with a profit of 15 per cent. Held, that plaintiffs were not subcontractors furnishing labor and materials to complete the work, but were rather lenders of credit to the contractor, and as such were not entitled to recover a deficit on the contractor's bond given to pay laborers and materialmen, as provided by Act Cong. Aug. 13, 1894 (28 Stat. 278, c. 280, § 1 [U. S. Comp. St. 1901, p. 2523]).

3. SAME.

If plaintiffs should be regarded as subcontractors, they were only such for a fixed price, to wit. the funds earned by a completion of the contract, and the use of the contractor's plant, so that, if loss was sustained, they were not entitled to resort to the bond.

On Rehearing.

4. ASSIGNMENTS—RIGHTS OF ASSIGNEE AND SURETY OF ASSIGNOR—PRIORITIES.

Where defendant became surety for a government contractor, its right to subrogation to the right of the contractor to percentages withheld by the government from time to time, on estimates for work done prior to an equitable assignment of the contract, was superior to any claim to such percentages by the assignees.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 4, Assignments, § 183.]

Appeal from the Circuit Court of the United States for the Western District of Kentucky.

John B. Baskin, for appellant.
Henry Fitts, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

150 F.—30

LURTON, Circuit Judge. This appeal involves only the liability of the National Surety Company, as surety upon a government contractor's bond made in pursuance of the act of Congress of August 13, 1894 (28 Stat. 278, c. 280, § 1 [U. S. Comp. St. 1901, p. 2523]), to the appellants, Hardaway & Prowell, who claim to have supplied the contractors and principal obligors in the bond with labor and material. The only facts necessary to be stated are these: The firm of Willard & Cornwell, composed of James E. Willard, Charles L. Cornwell, and Joseph Coyne, contracted on October 5, 1899, with the government for the construction of lock and dam No. 4, Black Warrior river, Ala. This contract involved the supplying of a large amount of materials and labor, and the contractors were required to execute a bond in the penal sum of $50,000, conditioned, first, that the contractors would perform their contract according to its true intent and meaning; and, second, that "they would make full payments to all persons supplying them labor or materials in the prosecution of the work provided for in said contract." They executed this bond with the National Surety Company as surety. The contractors prosecuted the work as a firm for a year or more, and then, for reasons not necessary to be stated, Willard and Cornwell assigned their interests in the contract to their associate, Joseph Coyne, who agreed to assume all debts of the firm and prosecute the work at his own risk and for his own benefit. As between the partners, we see no valid objection to this agreement. It could not affect the United States, and was never intended to substitute Coyne for Willard, Cornwell and Coyne, and was effective only as an assumption by one of the firm of the debts of the firm in consideration of the receipt of the benefits to be derived from the execution of the agreement. Burck v. Taylor, 152 U. S. 634, 14 Sup. Ct. 696, 38 L. Ed. 578, and Prairie Bank v. U. S., 164 U. S. 227, 17 Sup. Ct. 142, 41 L. Ed. 412. Coyne went on with the contract, but at last found himself unable to complete the work. In this situation he entered into a contract for the completion of the work with the appellants, Hardaway & Prowell. As the legal right of Hardaway & Prowell to look to the bond originally given by Willard & Cornwell with the appellee, the National Surety Company, as surety, for their protection, depends upon the true intent and meaning of this contract. It is here set out in full:

"State of Alabama, Tuscaloosa County:

"This contract made this the 2nd day of June, 1903, by and between B. H. Hardaway and R. P. Prowell, hereinafter called Hardaway & Prowell, as parties of the first part, and Joseph Coyne, as party of the second part, witnesseth:

"That, whereas, Willard & Cornwell, a firm composed of J. E. Willard, C. R. Cornwell and the said Joseph Coyne, did, heretofore, on to wit, the ——— day of ———, 1899, enter into a contract with the United States for the construction of Lock No. 4 in the Black Warrior River above Tuscaloosa, Alabama, and whereas, shortly after the beginning of the work upon said lock the said Joseph Coyne, by an arrangement between him and his copartners, undertook to complete and finish said lock according to the specifications of the contract of said firm with the United States, and in consideration of such an undertaking acquired the beneficial interest of said firm in said contract and was to receive all amounts paid by the United States in consideration of such contract, and, whereas, said lock is still uncompleted, and the said Joseph Coyne cannot, on account of his inability to procure the necessary financial

aid and on account of the disorganization of his labor forces and for various and sundry other reasons, complete and finish the said work in accordance with the said contract, and whereas said contract is a valued asset to the said Joseph Coyne if the said work can be prosecuted to its completion under the terms of said contract, there being held in reserve by the government under the terms of said contract about $8,300.00, which has already been earned by said Coyne, and whereas by reason of his said inability to finish said work the said contract is about to be forfeited, and the said Coyne is in imminent danger of losing, not only what profits may be made upon the completion of the work, but the entire reserve fund also retained by the government, and whereas the said Joseph Coyne for the purpose of preventing the forfeiture of said contract, has made overtures to the said Hardaway & Prowell to take up said work and complete it, and the said Hardaway & Prowell have agreed to do so upon the terms and stipulations hereinafter set forth. Now, therefore:

"(1) The said Hardaway & Prowell do hereby undertake and agree with the said Joseph Coyne to superintend the completion of the said lock and dam No. 4 and to furnish the necessary finances for the completion thereof and to put in charge of said work a competent superintendent and to properly organize the work for an energetic prosecution thereof to completion for which services they are to receive an agreed compensation of 15 per cent. upon the total cost of completing said contract, which total cost shall be construed to include all amounts necessarily expended and expenses incurred by Hardaway & Prowell in the completion of said work and all amounts necessarily paid and expenses incurred by them to effect a settlement with and an acceptance o. said lock and dam by the United States.

"(2) The said Joseph Coyne agrees to the above compensation for Hardaway & Prowell and further agrees to turn over to them entire charge of the completion of said work, and not to interfere with them in any way in the prosecution of said work to completion, and further agrees to turn over to the said Hardaway & Prowell the entire outfit of machinery, tools, etc., which he now has at said lock and dam and the quarries where he is getting stone, and to give the use of the same to them for the completion of said work free of any charge.

"(3) The said Joseph Coyne further agrees to have all checks for each estimate upon said work forwarded by the government to the said Hardaway & Prowell and to properly endorse such checks so that they may be collected by Hardaway & Prowell.

"(4) It is further agreed by all parties hereto that out of the proceeds of the checks referred to in the next foregoing paragraph the obligations shall be paid preferentially in the following order:

"(1) The compensation of the said Hardaway & Prowell as herein agreed for their services.

"(2) All moneys advanced by Hardaway & Prowell and used in the prosecution of said work.

"(3) All debts necessarily incurred by the said Hardaway & Prowell for the prosecution of said work other than debts for labor and material.

"(4) All debts incurred by said Hardaway & Prowell for labor and material or moneys advanced by them in payment for labor or material debts.

"(5) The said Joseph Coyne, for the completion of said work and for the securing to the said Hardaway & Prowell all amounts, that they shall have to pay on whatever account for the completion of said lock and dam and for a settlement with the United States and acceptance of said lock and dam by the proper authorities of the government, does hereby assign and set over to the said Hardaway & Prowell all his interest in the amount, aggregating as aforesaid about $8,300.00, retained and now held in reserve by the government under the said contract for the building of said lock and dam, which shall be applied by the said Hardaway & Prowell in the following order:

"(1) To the payment of all debts for labor and material incurred in the building of said lock and dam.

"(2) Any balance that may be due to said Hardaway & Prowell for their compensation under this contract.

"(3) All other necessary debts incurred in the prosecution of the said work by Hardaway & Prowell and all amounts including expenses which they shall

have to pay in order to effect a settlement with the government and acceptance by it of said lock and dam.

"(4) Any balance to be· paid to the said Joseph Coyne.

"(6) It is understood and agreed by all parties hereto that if the said Joseph Coyne should at any time fail or be unable to turn over to the said Hardaway & Prowell the checks for estimates on said work properly endorsed so that Hardaway & Prowell can collect them or should fail to secure the collection of ·them by the said Hardaway & Prowell then the said Hardaway & Prowell shall in that event have the option of annulling said contract and stopping work without notice to the said Joseph Coyne, or to any other parties whomsoever, but in said event the said Hardaway & Prowell shall have a claim against the said Joseph Coyne for all moneys furnished by them and expenses incurred by them upon any account whatsoever in the prosecution of said work, and which shall not have been repaid to them, and for all compensation earned under this contract and not paid to them, and such claim shall be due and payable at once upon their termination of the contract.

"In witness whereof the said parties of the first and second parts have hereunder set their hand's and seals in duplicate, this the day and year first above written.                                                    "B. H. Hardaway.
                                                             "R. P. Prowell.
                                                             "Joseph Coyne.

"Attest:  C. B. Verner."

Storms, freshets, and overflows, as claimed by the appellants, added to the cost of completing the unfinished lock and dam, so that, when the work was finally accepted by the government, they had expended for work and labor, including their own commissions under their agreement with Coyne, the sum of about $36,000 in excess of the moneys collected by them from the government according to the terms of their agreement with Coyne.  The question is whether this loss is one which constitutes a claim for labor and materials supplied the contractors for the prosecution of the work within the meaning of the bond.

The bond required under the act of August 13, 1894, has two distinct· purposes.  First, it is intended to secure the fulfillment of the agreement between the principal contractors and the government, and by an amendment of the act made February 24, 1905 (33 Stat. 811, c. 778 [U. S. Comp. St. Supp. 1901, p. 493].), preference is given to this provision of the contract.  The second condition of the bond is exclusively for the protection of persons supplying labor and materials to the contractors.  The contract has been carried out.  The government has accepted the lock and dam, and the obligation of the bond in its primal aspect has been discharged.  The benefits of the bond in its secondary aspect are not limited to those directly supplying the contractors with labor and materials.  In Hill v. American Surety Company, 200 U. S. 197, 205, 26 Sup. Ct. 168, 171, 50 L. Ed. 437, it was said by Justice Day, speaking for the court:

"In view of the declared purpose of the statute, in the light of which this bond must be read, and considering that the act declares in terms the purpose to protect those who have furnished labor or material in the prosecution of the work, we think it would be giving too narrow a construction to its terms to limit its benefits to those only who supply such labor or materials directly to the contractor.  The obligation is 'to make full payments to all persons supplying it with labor or materials in the prosecution of the work provided for in said contract.'  This language, read in the light of the statute, looks to the protection of those who supply the labor or materials provided for in the contract, and not to the particular contract or engagement under

which the labor or materials were supplied. If the contractor sees fit to let the work to a subcontractor, who employs labor and buys materials which are used to carry out and fulfill the engagement of the original contract to construct a public building, he is thereby supplied with the materials and labor for the fulfillment of his engagement as effectually as he would have been had he directly hired the labor or bought the materials."

In Hill v. American Surety Company the principal contractor was the New Jersey Foundry Company. That company subcontracted a part of the work to the Richard Manufacturing Company. This subcontractor employed the two Hills to do certain of the work they had undertaken to do, and agreed to pay them $246.80 in full. The subcontractor only paid part, and the Hills were held to be persons who had supplied labor and materials to the original contractors within the meaning of the bond, and were given a judgment, not for the value of the labor and materials, but for the balance of the price which the contractors had agreed to pay them and which they had agreed to accept, the sum of $141.80. Thus it is clear that under this very satisfactory and authoritative opinion the appellants, Hardaway & Prowell, will be entitled to proceed against the bond given by Willard & Cornwell for any balance due them upon the price which Coyne in good faith agreed to pay them for the completion of the lock and dam in question, provided they occupy the attitude of subcontractors who have furnished labor and materials to the contractors. Whether Coyne, after he had acquired the beneficial interest of his partners in the contract and assumed its burdens, is to be regarded as an original principal contractor or as a subcontractor, is of no practical importance. In either event persons who supplied him with labor and materials for the carrying on of the contract were within the protection of the bond, according to Hill v. American Surety Company. This the court below held, and all such claimants were given decrees against the bond. From these decrees the National Surety Company has not appealed. Neither does it make any difference in determining the liability of the bond to Hardaway & Prowell, whether we regard Coyne as an original or as a subcontractor. In either event, persons supplying him with labor and materials with which to execute the contract with the government would be within the intent of the bond.

The contract between appellants and Coyne, set out above, is not free from obscurity. Appellants insist that they became mere subcontractors under Coyne, and that they were to receive from Coyne the entire amount of the cost to them of the work and a commission of 15 per cent. upon the gross expenditures. Upon this interpretation they say that the balance remaining after applying the amounts paid them, through Coyne in government checks, for work theretofore done and for work completed by them, constitutes a claim for labor and materials supplied by them as subcontractors, for which Coyne is liable to them. This interpretation is not easy to defend, and is not the most natural one in view of all the provisions of the contract. First, there is the conceded fact that there is no express provision to that effect. If this had been the agreement as the parties understood it, we would expect to find so important a provision explicitly stated. But counsel say that the law implies such an agreement. Undoubtedly, in the

absence of any stated consideration, the law does imply that one who performs work or supplies materials to another at his request shall be paid either their cost or their reasonable value. But is that this case? From the recitals of the contract itself it is plain that Coyne's trouble was that he did not have the capital necessary to go on. He found that he would have to forfeit the contract and with it the $8,300 already earned, but reserved by the government until completion of the work. Thus it is recited that the lock "was still uncompleted on account of his inability to procure the necessary financial aid."

It is true that it is also said that Hardaway & Prowell are "to take up said work and complete it," but the way in which they are to do this is to be found in the terms and stipulations which directly follow. Thus they agree, first, to superintend the construction of the work; second, they agree to put in a competent superintendent; third, to reorganize Coyne's demoralized labor force. These are all things consistent with a mere superintendence or management in the interest of Coyne. The next, and last stipulation, is of most moment. It is that "they will furnish the necessary finances for the completion thereof." Now, if Hardaway & Prowell are to go on as mere subcontractors and finish the work, supplying the necessary labor and materials, and receiving an agreed consideration for the work, why this explicit agreement to furnish necessary finances to complete the work? Especially is this significant in view of the fact that there is no agreement that they shall supply the necessary labor and materials to finish the work. If, as contended, there is an implied agreement to reimburse every outlay by Hardaway & Prowell in completing this work, is it more than an implied agreement to repay the money advanced under this contract to "furnish the necessary finances" to complete the job? In short, is not the agreement one by which the appellants are to supply the money and superintend its expenditure, this supervision enabling them to protect themselves against diversion? To repay the advances, the contract provides that future payments, earned by the prosecution of the work, should be indorsed over to Hardaway & Prowell, who, after paying their own commission, should pay out the rest in reimbursement of their advances or in payment of debts incurred on account of the work. This provision as to paying debts incurred for labor and materials is manifestly to relieve the contractors' bond.

For the further "securing" of Hardaway & Prowell, it is also provided that the $8,300 already earned should be assigned to them to the extent necessary. By way of compensation for what are called the "services" of Hardaway & Prowell, it is then provided that they shall have 15 per cent. commission upon their gross outlay, whether for labor or materials or other expenses. The attitude of Hardaway & Prowell as mere lenders of money is not, in substance, changed because that money was used in paying for labor and materials. Nor is the character of the claim, in its essence, changed by presenting it in the form of an account for the labor and materials which was procured by its application. Manifestly, if the money had been loaned to Coyne under the express agreement that he was to use it in supplying labor and materials to be used in this work, and it was so used,

the debt would still be a debt for money advanced, and not a debt for labor and materials, though every dollar was so applied. The same result must follow if Hardaway & Prowell, as mere superintendents, or managers for Coyne, used the money advanced by them in paying for like supplies. In both hypotheses the labor and materials would be supplied by Coyne, although the money which paid for them had been advanced by the appellants. Would a bank lending money to Coyne to be used by him in carrying out this contract be entitled to the protection of such a contractor's bond simply because the money was to be used, and was, in fact, used, in paying for labor and materials which were used in the work? If not, how much stronger is the equity of appellants even if they themselves used the money in paying for labor and materials which went into the work, if, in so applying it, they were merely acting as the agents or superintendents of Coyne? Money loaned would not be labor and materials. The labor hired and the persons actually supplying them with labor and materials might be protected as persons furnishing labor and materials to them as subcontractors, or as mere superintendents standing for and representing Coyne as a principal or subcontractor. But as mere agents for Coyne advancing money to him or for him, by paying for labor and materials supplied by others, they would not be subcontractors nor persons supplying subcontractors with labor and materials. Prairie State Bank v. United States, 164 U. S. 227, 252, 17 Sup. Ct. 142, 41 L. Ed. 412. One who lends money to keep a broken-down railroad in operation and to pay for labor and necessary supplies has never been regarded as entitled to the equitable lien accorded to those who actually supply labor and materials to keep the road going. Morgan's Louisiana, etc., Ry. Co. v. Texas Central Ry. et al., 137 U. S. 171, 11 Sup. Ct. 61, 34 L. Ed. 625; U. S. Trust Company v. Western Contract Co., 81 Fed. 454, 26 C. C. A. 472. Money borrowed and used to pay labor claims entitles the lender to no preference in the absence of an assignment of the claims. Theobald v. Hammond, 133 Fed. 525, 66 C. C. A. 496.

But, if this is not a mere agreement to "finance" Coyne and superintend the disbursement of the money advanced, we are led to the conclusion that, if subcontractors, they were so only under a special agreement to complete the work with Coyne's plant and his quarry for that part of the original contract price which would be earned by so doing. If this proved insufficient to reimburse them, then they might look to the reserved percentage in the hands of the government, amounting to $8,300, to the extent necessary to do that and to pay them their commissions, but no further. This view is borne out by a number of considerations. Among them is the fact that no stipulation is found looking to any other or further consideration when it would have been most natural, if the intent had been that Coyne should bear all the risk of a final loss, to have provided in plain terms that he should repay all of their disbursements as well as their commission. The fact that provision is made for the order in which the two funds, to be received through government payments, are to be applied by appellants, is inconsistent with the contention that the price to be paid them as subcontractors was to be the full cost of the work. If that was so, why was Coyne interested in the order in which the assigned funds should

be paid out by them? But if the agreement was that Hardaway & Prowell should take the risk and complete the work, using Coyne's plant and quarry for the money to be earned by so doing, but with the right to also call upon the reserved $8,300, in the contingency that the work should cost more than that part of the contract price to be earned by the completion, we can see some reason for providing that if the second fund is called upon that debts incurred for labor and materials shall be first paid. Such claims, as suggested heretofore, might be asserted as liabilities against the contractor's bond, and, if paid by the surety, would be debts for which Coyne would be liable over.

Another consideration leading to the same interpretation is found in the fact that the contract provides that the work was to be completed upon the terms and stipulations recited. One of the considerations named is that appellants are to have the use of Coyne's plant and quarry free of expense. Another is that he is to receive the money already earned and to be earned, only the surplus of first-named fund to be paid over to Coyne in the event these funds prove more than sufficient to repay them for every kind of disbursement and also a profit of 15 per cent. In one contingency only is there any provision for any payment to be made by Coyne to them, except to the extent of the two funds mentioned, and that is in the event appellants shall cancel the contract for a breach by him in respect to the assignment of the two funds out of which they were to pay themselves. If, therefore, they are to be regarded as subcontractors, they are only such for a fixed price, being the two funds earned by completion and the free use of Coyne's plant. If they suffered unexpected losses, they must bear them. The price for which they agreed to do the work has been paid them, and they may not recover against the surety what they could not recover against the principal obligor. It was a speculative contract upon their side. They believed they could see their way through and realize a handsome commission. They took their chances and selected their own mode of payment.

The decree disaffirming their claims must be affirmed.

## On Petition for Rehearing.

A petition to rehear has been filed. We rested our decision affirming the decree below upon the ground that Hardaway & Prowell were not subcontractors at all. But upon the assumption that they could be so considered we said:

"They are only such for a fixed price, being the two funds earned by completion and the free use of Coyne's plant. If they suffered unexpected losses, they must bear them. The price for which they agreed to do the work has been paid them, and they may not recover against the surety what they could not recover against the principal obligor."

It is now said that one of the funds to be paid them upon the theory that they were contractors for a fixed price, namely, the retained percentages for work done before Hardaway & Prowell became connected with the contract, has not, in fact, been paid to them; that this fund was paid into the court below and is there to-day; and that in any

view of the case ought to be paid to Hardaway & Prowell by virtue of the assignment to them by the contractors. No error was assigned in respect of this, and no attention called to the disposition of that fund by brief or otherwise. We therefore inadvertently and erroneously stated that Hardaway & Prowell had received the price for which they agreed to do the work upon the theory that they were contractors.

The court below in respect of this fund said:

"This fund, as before indicated, is $8,176.75. It is made up of certain percentages withheld by the government from time to time out of what would otherwise have been due under the contract. It appears from the record that the whole sum was reserved upon the estimates for work done previous to June 2, 1903, and consequently the surety is entitled to the full benefit of this fund, though Hardaway & Prowell, in my judgment, would have been entitled to any reservation in respect to the work done after June 2, 1903. Section 3468, Revised Statutes of the United States, respecting the rights of sureties, may also support this conclusion of the court, even if the facts in the record do not otherwise make it clear. It results that the complainant is liable for $13,261.76 on the claims of classes 1 and 2. This sum includes, of course, the $8.176.75, the fund in court. The difference, namely, $5,085.01, and the costs of this action, should be paid into the court by it."

This is manifestly correct. The surety company's equity of subrogation is antecedent to any claim arising under the mere equitable assignment under which Hardaway & Prowell claim. Prairie State Bank v. United States, 164 U. S. 227, 17 Sup. Ct. 142, 41 L. Ed. 412; First Nat. Bank v. City Trust Bank, 114 Fed. 529, 52 C. C. A. 313; Reid v. Pauly, 121 Fed. 652, 58 C. C. A. 152; Henningsen v. United States, etc., Co., 143 Fed. 810, 74 C. C. A. 484. The application of that fund to the payment of claims for material and labor accruing before the assignment to Hardaway & Prowell is something of which Hardaway & Prowell cannot justly complain, inasmuch as any right of assignment is subordinate to the equity of the surety company to have the fund applied so as to relieve their liability. The right to go upon the surety company to the extent that such application leaves them unpaid could only arise if Hardaway & Prowell were subcontractors. That we held they were not. In that part of the opinion above set out we only undertook to state their utmost right if they should be so held.

Rehearing denied.

NOTE.—The following is the opinion of Evans, District Judge:

EVANS, District Judge. The complainant, by its bill filed October 24, 1904, shows that the United States had on October 5, 1899, accepted the bid of the firm of Willard & Cornwell, composed of James E. Willard, Charles L. Cornwell, and Joseph Coyne, for the construction of lock and dam No. 4, Black Warrior river, in the state of Alabama; that the construction thereof required a large amount of material and labor, and that under the requirements of Act Cong. Aug. 13, 1894, c. 280, § 1, 28 Stat. 278 [2 Comp. St. 1901, p. 2523], the said firm was required to give and did give a bond in the penal sum of $50,000 for the faithful performance of their contract and for prompt payment to all persons supplying said firm with labor and material in the prosecution of the work under the contract. We need not notice the elaborate contract between the United States and the firm covering the details of the work, but the provisions of the bond as distinguished from the contract are most important, and are as follows:

"Contractor's Bond (Public Works).

"Know all men by these presents, that we, James E. Willard, Charles L. Cornwell, and Joseph Coyne, partners composing the firm of Willard & Cornwell, of Louisville, Kentucky, as principals, and National Surety Company, of New York City, a corporation existing under the laws of the State of New York, as surety, are held and bound unto the United States of America in the penal sum of fifty thousand ($50,000.00) dollars, to the payment of which sum well and truly to be made, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally, firmly by these presents.

"The condition of this obligation is such, that whereas the above-bounden Willard & Cornwell have, on the twenty-eighth day of September, 1899, entered into a contract with the United States, represented by Major Wm. T. Russell, Corps of Engineers, U. S. Army, for construction of lock and dam No. 4, Black Warrior River, Ala:

"Now, therefore, if the above-bounden Willard & Cornwell, heirs, executors, or administrators, shall and will, in all respects, duly and fully observe and perform all and singular the covenants, conditions, and agreements in and by the said contract agreed and covenanted by said Willard & Cornwell to be observed and performed according to the true intent and meaning of the said contract, and as well during any period of extension of said contract that may be granted on the part of the United States as during the original term of the same, and shall promptly make full payments to all persons supplying them labor or materials in the prosecution of the work provided for in said contract, then the above obligation shall be void and of no effect; otherwise to remain in full force and virtue."

The firm commenced, and for a year or more continued the work, but ultimately, in February, 1901, abandoned it (so far as two of its members could) to the other member, viz., Joseph Coyne, under the following contract, viz.:

"This agreement, made and entered into by and between J. E. Willard, and C. L. Cornwell, parties of the first part, and Joseph Coyne, party of the second part.

"Witnesses, whereas, the said parties under the firm name of Willard & Cornwell have now and have heretofore had a contract with the government of the United States for the building and construction of Lock and Dam No 4 on the Black Warrior River in the county of Tuscaloosa in the state of Alabama, and, whereas, the said firm of Willard & Cornwell, as composed of the said J. E. Willard and C. L. Cornwell and Joseph Coyne, is a firm and co-partnership formed only for the purpose of building and constructing the lock and dam aforesaid, and for no other purpose, and whereas, for the benefit of the government, and for the convenience of the said parties and of all persons now, or hereafter to become interested in said work, it is deemed advisable and beneficial that the said Joseph Coyne shall pay all the debts now due by said firm, and have and receive all the profits heretofore accruing or hereafter to accrue on said work, and whereas, the said Coyne has purchased from the said firm the plant, tools, and machinery herein mentioned, and desires to protect himself as well as the government of the United States in all and every way possible to him and to the said firm, and whereas, the said Coyne is the owner, as among said parties, of all the tools, machinery and plant now in said county of Tuscaloosa, and used or to be used in and about said work, which were put into said firm by the said Willard and the said Cornwell, and whereas, the said Coyne desires to pay to the said Willard and to the said Cornwell together the sum of forty-four hundred dollars ($4,400.00), and, whereas, as between said co-partners and the government and others, they, the said Willard and the said Cornwell have fully empowered and constituted the said Joseph Coyne, as agent, and attorney in fact of said firm to receive all moneys now due, or hereafter to become due to said firm by reason of, or in any manner arising from said contract with the government, as aforesaid, and it is agreed between the parties that the said Coyne shall execute and deliver to said J. E. Willard and C. L. Cornwell his two promissory notes of even date, herewith, each for the sum of twenty-two hundred dollars ($2200.00) and payable respectively in six and nine months after date, and that to secure the payment of said notes by said Coyne to said J. E. Willard and C. L. Cornwell, they,

the persons last mentioned, shall have a lien upon said plant, tools and machinery now used in and about said work and by them heretofore put into the firm assets, and that upon the payment by said Coyne of said notes, all interest of said Willard and of said Cornwell in said tools, plant, and machinery, shall cease. It is further agreed that all future purchases for said Lock and Dam No. 4 are to be made in the name of Joseph Coyne alone, and that he is to pay the debts of said firm as aforementioned.

"Witness our hands at Louisville, Ky., this fifth day of February, 1901.

"J. E. Willard.

"C. R. Cornwell.

"Joseph Coyne.

"State of Alabama, Tuscaloosa County:

"I, Jas. C. Brown, Judge of Probate, hereby certify that the foregoing conveyance was filed in my office for registration on the 8th day of February, 1901, and duly recorded in Contract Record No. 1, pages 471 and 472.

"Jas. C. Brown, Judge of Probate."

Coyne continued the work for a time, but getting into difficulties in June, 1903, made a contract with Hardaway & Prowell, as follows:

"State of Alabama, Tuscaloosa County:

"This contract made this the 2nd day of June, 1903, by and between B. H. Hardaway and R. P. Prowell, hereinafter called Hardaway & Prowell, as parties of the first part, and Joseph Coyne, as party of the second part, witnesseth:

"That, whereas, Willard & Cornwell, a firm composed of J. E. Willard, C. R. Cornwell and the said Joseph Coyne, did, heretofore, on to wit, the ——— day of ———, 1899, enter into a contract with the United States for the construction of Lock No. 4, in the Black Warrior River above Tuscaloosa, Alabama, and whereas, shortly after the beginning of the work upon said lock the said Joseph Coyne, by an arrangement between him and his co-partners, undertook to complete and finish said lock according to the specifications of the contract of said firm with the United States, and in consideration of such an undertaking acquired the beneficial interest of said firm in said contract and was to receive all amounts paid by the United States in consideration of such contract, and, whereas, said lock is still uncompleted, and the said Joseph Coyne cannot, on account of his inability to procure the necessary financial aid and on account of the disorganization of his labor forces and for various and sundry other reasons, complete and finish the said work in accordance with the said contract, and whereas said contract is a valued asset to the said Joseph Coyne if the said work can be prosecuted to its completion under the terms of said contract, there being held in reserve by the government under the terms of said contract about $8,300.00, which has already been earned by said Coyne, and whereas by reason of his said inability to finish said work the said contract is about to be forfeited, and the said Coyne is in imminent danger of losing, not only what profits may be made upon the completion of the work, but the entire reserve fund also retained by the government, and whereas the said Joseph Coyne for the purpose of preventing the forfeiture of said contract, has made overtures to the said Hardaway & Prowell to take up said work and complete it, and the said Hardaway & Prowell have agreed to do so upon the terms and stipulations hereinafter set forth. Now therefore:

"(1) The said Hardaway & Prowell do hereby undertake and agree with the said Joseph Coyne to superintend the completion of the said lock and dam No. 4 and to furnish the necessary finances for the completion thereof and to put in charge of said work a competent superintendent and to properly organize the work for an energetic prosecution thereof to completion for which services they are to receive an agreed compensation of 15 per cent. upon the total cost of completing said contract, which total cost shall be construed to include all amounts necessarily expended and expenses incurred by Hardaway & Prowell in the completion of said work and all amounts necessarily paid and expenses incurred by them to effect a settlement with and an acceptance of said lock and dam by the United States.

"(2) The said Joseph Coyne agrees to the above compensation for Hardaway & Prowell and further agrees to turn over to them entire charge of the com-

pletion of said work, and not to interfere with them in any way in the prosecution of said work to completion, and further agrees to turn over to the said Hardaway & Prowell the entire outfit of machinery, tools, etc., which he now has at said lock and dam and the quarries where he is getting stone, and to give the use of the same to them for the completion of said work free of any charge.

"(3) The said Joseph Coyne further agrees to have all checks for each estimate upon said work forwarded by the government to the said Hardaway & Prowell and to properly endorse such checks so that they may be collected by Hardaway & Prowell.

"(4) It is further agreed by all parties hereto that out of the proceeds of the checks referred to in the next foregoing paragraph the obligations shall be paid preferentially in the following order:

"(1) The compensation of the said Hardaway & Prowell as herein agreed for their services.

"(2) All moneys advanced by Hardaway & Prowell and used in the prosecution of said work.

"(3) All debts necessarily incurred by the said Hardaway & Prowell for the prosecution of said work other than debts for labor and material.

"(4) All debts incurred by said Hardaway & Prowell for labor and material or moneys advanced by them in payment of labor or material debts.

"(5) The said Joseph Coyne, for the completion of said work and for the securing to the said Hardaway & Prowell all amounts, that they shall have to pay on whatever account for the completion of said lock and dam and for a settlement with the United States and acceptance of said lock and dam by the proper authorities of the government, does hereby assign and set over to the said Hardaway & Prowell all his interest in the amount, aggregating as aforesaid about $8300.00 retained and now held in reserve by the government under the said contract for the building of said lock and dam, which shall be applied by the said Hardaway & Prowell in the following order:

"(1) To the payment of all debts for labor and material incurred in the building of said lock and dam.

"(2) Any balance that may be due to said Hardaway & Prowell for their compensation under this contract.

"(3) All other necessary debts incurred in the prosecution of the said work by Hardaway & Prowell and all amounts including expenses which they shall have to pay in order to effect a settlement with the government and acceptance by it of said lock and dam.

"(4) Any balance to be paid to the said Joseph Coyne.

"(6) It is understood and agreed by all parties hereto that if the said Joseph Coyne should at any time fail or be unable to turn over to the said Hardaway & Prowell the checks for estimates on said work properly endorsed so that Hardaway & Prowell can collect them or should fail to secure the collection of them by the said Hardaway & Prowell then the said Hardaway & Prowell shall in that event have the option of annulling said contract and stopping work without notice to the said Joseph Coyne, or to any other parties whomsoever, but in said event the said Hardaway & Prowell shall have a claim against the said Joseph Coyne for all moneys furnished by them and expenses incurred by them upon any account whatsoever in the prosecution of said work, and which shall not have been repaid to them, and for all compensation earned under this contract and not paid to them, and such claim shall be due and payable at once upon their termination of the contract.

"In witness whereof the said parties of the first and second parts have hereunder set their hands and seals in duplicate, this the day and year first above written.

"B. H. Hardaway.
"R. P. Prowell.
"Joseph Coyne.

"Attest: C. B. Verner."

The bill charges that although each and all of the defendants agreed in their application to complainant to become their surety on the bond, to bestow upon the work their personal attention and supervision, they each and all failed

to do so. These allegations, however, do not seem to be material to any question now involved.

On November 8, 1904, an order was made by agreement of parties directing the payment to R. P. Prowell of $1,607.68, then described as the amount of the then last estimate made by the United States on the work, and he was directed or permitted to use the amount or so much of it as was necessary for the completion of the lock and dam, and to pay any surplus into court. On March 15, 1905, he reported that he had not only paid out all of the $1,607.68, but in addition had expended a further sum of $865.28—a total of $2,472.96. I find no order authorizing the expenditure of the excess, but most probably the excess expenditure had reference to the contract last above copied.

The bill in this case was filed after the situation in October, 1904, had been discovered by the complainant, and under the operation of the orders made herein a further balance due on the work by the United States amounting to $8,176.75 was on May 31, 1905, paid into court, where it now remains. The United States has no further concern with the case, and all questions involved are those which grew out of claims for labor and materials supplied either to Willard & Cornwell or to Joseph Coyne or by or to Hardaway & Prowell.

Without any formal pleadings by any of those who claim to have supplied labor and materials, the court, pursuant to the request and stipulation of the parties, entered an agreed order on November 8, 1904, referring the case to the special master to audit the claims, etc. When this order was entered, no idea was conveyed of the various and somewhat intricate questions that might come up when the claims were presented, and when the last two contracts above copied should be filed. Hence, it was not anticipated that a state of case would arise which would call for the laying down of exact rules for the guidance of the special master. Indeed, the court was in no way advised of the status until called upon to hear argument on the pending exceptions to the special master's report. The investigation of certain important legal questions which might more appropriately have been made at the reference was for that reason delayed until the present. As already intimated, some parts of the claims for labor and materials supplied, which were filed before the special master, arose before the contract of February 5, 1901, between James E. Willard and Charles L. Cornwell on the one side and Joseph Coyne on the other. Some parts of them arose between that date and the 2d day of June, 1903, when the contract was made between Joseph Coyne on the one side and Hardaway & Prowell on the other, and still more of them arose after the making of that contract. Each of these three sets of claims demand separate treatment.

Class 1: It appears that only part of one of the claims was created before February 5, 1901, namely, part of the claim of the Tidewater Coal Company. This claimant had supplied to the original firm material used in the prosecution of the work to the extent of $361.85, which had not been paid, and that sum with interest is reported to be $516.23. I cannot agree that any part of the claim of Allen-Jamison Company comes into this class. While several thousand dollars of this claim were for supplies purchased before February 5, 1901, the proper application of the payments made before June 2, 1903, extinguished that part of the indebtedness. This, however, is not very material.

Class 2: The balance of the claim just mentioned, namely, $557.68 thereof, is for materials and labor claimed to have been supplied after February 5, 1901, and interest thereon. In addition to these two, eleven other persons, corporations, and firms claim to have supplied labor and materials or to be the assignees of those who did, and these materials and all the labor are asserted to have been used in the prosecution of the work on the lock and dam between February 5, 1901, and June 2, 1903.

Class 3: Only one claim of this class was presented to the special master, to wit, that of Hardaway & Prowell, and this claim to the extent of $32,757.54 was allowed by him. In the main the special master allowed most of the claims, one of the second class, though he reduced some of them on account of items not properly to be regarded as labor or materials, and many exceptions have been filed directed to this part of his report. The complainant has also filed many exceptions which have relation to the claim of Hardaway

& Prowell, and the latter have excepted to the action of the special master in disallowing some items of their claims.

1. It is conceded upon all hands that $516.23 of the claim of the Tidewater Coal Company, which covers items for labor and materials supplied to the firm of Willard & Cornwell previous to February 5, 1901, is a just and proper claim against the fund in court if not against the complainant. The court is of the opinion that that part of that claim is a proper charge, both against the fund and against the complainant as well.

2. But it is most earnestly insisted that the complainant is not personally liable for any part of the claims of class 2. It is pointed out that all of these claims were created with the full knowledge upon the part of the respective claimants that Joseph Coyne alone was conducting the work on the lock and dam after February 5, 1901, and that all of the accounts representing those claims were for that reason charged to Coyne alone, and none of them were charged to Willard & Cornwell. It is also pointed out that the bond given to the United States, and upon which alone this class of claimants can rely in this proceeding, after binding the obligors therein to certain stipulations respecting the contract with the United States, also stipulates that said obligors, including the complainant, "shall promptly make full payments to all persons supplying them labor or materials in the prosecution of the work provided for in said contract." The complainant contends that it is a mere surety and is bound precisely as it contracted and no further; that the stipulation just copied binds it to promptly pay all claims for labor and materials supplied to Willard & Cornwell as a firm, and that that firm is alone included in the pronoun "them" as used in the provision just copied; that it necessarily increased and certainly changed the risk and liability of the surety for the complainant to furnish the supplies to and upon the credit of one person instead of the credit and ability to pay of three persons, and that as all of the claimants of class 2 knew of the contract of February 5, 1901, and supplied labor and materials of Joseph Coyne alone and not to "them" (that is to say, not to the firm of Willard & Cornwell), the complainant upon general principles of law is not bound for any of this class of claims. There are, indeed, certain general principles of law relating to principal and surety which have been long established. Among them are, first, that the surety's contract is to be strictly construed; second, that any change in the contract without the consent of the surety releases him; and, third, that any increase of his risk without his consent also releases him. These principles are strongly pressed as bearing upon claims in classes 2 and 3. Here the contract between the United States on the one side and Willard & Cornwell and the surety company on the other was not itself changed by the parties to it, but with the knowledge of the claimants, who credited Joseph Coyne alone, the partners composing the firm of Willard & Cornwell, as between themselves, changed their relations and contract, and, as far as they could do so, transferred their rights and liabilities to one only of the partners. Evidently this change was without the knowledge or consent of a not very vigilant surety; but upon all the grounds indicated, and perhaps others, it is strenuously insisted that the surety was released, and it might be hard to resist this conclusion but for one authority. In the very recent case of United States et al. v. American Surety Co. (decided January 2, 1906) 26 Sup. Ct. 168, 50 L. Ed. 437, the Supreme Court had occasion to look into the object of the legislation to which we have referred, and the purpose and scope of the penal bond required thereunder, and as labor and materials were supplied by this class of claimants to Joseph Coyne, who was a member of the firm of Willard & Cornwell, the original and principal contractors, and as that labor and those materials under Coyne's express orders and supervision actually went into the work done under the contract with the United States, I have concluded that the stress of the opinion in that case requires me to hold that the labor and materials supplied to Coyne and used by him in the work done under the contract come within the obligation of the complainant. I do this with some hesitation because no question growing out of the change of the contract relation of the principal obligors was presented in the case referred to, and the condition now confronting us might not have been within the view of the Supreme Court when it remarked that it did not see how the surety in that case could be injured by

what had actually occurred. There had been a subcontractor in that case and not a dissolution of a partnership. A subcontractor is a very familiar character. One contracts to build a house and then subcontracts with A. for the foundation, with B. for the brick work, with C. for the plumbing, with D. for the carpentering, etc. But here I think there is no such simple thing as that, but something more and something entirely different.

1. therefore, put my judgment upon this class of claims upon the ground that Coyne was a principal in the bond, and that the labor and materials were supplied to him as such, and not upon the ground that he was a subcontractor within the purview of the opinion in United States v. American Surety Co. This general proposition being settled, we are brought to inquire as to the exact amounts due each of this class of claimants. In this connection at least there can be no latitudinous construction of the contract of the surety It is entitled here to a strict adjudication of its rights. It contracted for the prompt payment of all just claims for labor and materials supplied to "them" (meaning Willard & Cornwell), and used in the prosecution of the work provided for in the contract with the United States. Nothing but labor and materials. in the proper sense of those terms, which were used in the prosecution of the work "provided for in the contract" with the United States, can be taken into account in passing upon these claims. Courts have probably been more or less astute to find the exact principles governing such cases, but I may say once for all that I do not think that labor and materials used in the construction of houses for laboring men and kindred objects come within the liability of the surety. because I do not find that any of these things were provided for in the contract with the United States, filed in the record, and hence persons who supplied labor and materials for these outside objects are not protected and were never intended to be protected by the penal bond exacted by the government under the statute, which bond only stipulated for the prompt payment of claims for labor and materials supplied for the work the United States had contracted for when the bond was exacted. For other claims, even if closely connected with the interest of the contractors, their creditors must look to them alone. The obligation of the surety is one of strict law.

In the main, the original exceptions. filed April 9, 1906, by the complainant to the allowance of the claims in class 2, are based upon the general ground that it is not bound for any of them because of the contract of February 5, 1901. But all exceptions based upon that contention must be overruled upon the grounds we have heretofore indicated.

Additional exceptions were filed by the complainant on April 17, 1906, and while they, including the so-called "exhibits" referred to therein, and also including a reference back to the original exceptions, are rather too vague, or at least in some particulars, to demand the court's attention, we have nevertheless gone into them all with some care, and will in detail take up each of the claims of class 2.

J. M. Wentzell, Assignee: The special master allowed this claim, including interest, and the exceptions thereto are either upon the general ground that the surety is not bound therefor because the labor and materials were supplied to Coyne alone, or else the exceptions are too vague to require further notice. All exceptions to the allowance of this claim are overruled.

Strickland Bros. Machine Company: The exception to the allowance of this claim is that the whole account is for repairs on machinery, but I think the evidence and the stipulation in regard to it sustains the action of the special master, and all exceptions thereto are overruled.

J. Snow Hardware Company: I think the evidence sustains the action of the commissioner on this claim, and the surety's exceptions to its allowance are all overruled. The claimant's own exceptions to the report of the special master on account of his refusal to allow certain items of the account filed are likewise overruled.

J. E. Baker: This claim appears to be sustained by the evidence, and complainant's exceptions thereto are overruled.

F. G. Blair: The same may be said of this claim, and the exceptions to its allowance are overruled.

Weatherford Printing Company: This claim is too insignificant to consume time for much inquiry as to whether the special master was right or wrong in allowing it. We shall presume that he was right, and overrule the exceptions filed to this part of the report.

Tidewater Coal Company: The allowance of this claim was clearly right, both as to the part which we have placed in class 1 and as to the part which we have placed in class 2. The exceptions to it are therefore overruled.

Harder Planing Mill & Lumber Company: The stipulation as to this claim shows it to be a proper one unless I am wrong in the general view I have taken as to its being within the terms of the penal bond. All exceptions to its allowance are consequently overruled.

Carolina Portland Cement Company: If I am correct in the general views I have expressed, the exceptions to this claim must be and they are overruled. For reasons which have been stated I think it clearly comes within the penal bond.

R. P. Prowell: The original exceptions to the allowance of this claim are too vague to require further notice, even when we include the so-called "exhibit." The amended exceptions fall within the general views expressed as to the liability of the surety for labor and materials supplied to Coyne, and all exceptions to the allowance of this claim are overruled.

"Allen-Jamison Company: The exceptions of the complainant to the allowance of this claim are overruled upon two grounds, namely, first, that it makes no difference that the labor and materials referred to therein were supplied to Joseph Coyne; and second, because I do not think the finding of the special master thereon was flagrantly against the evidence, if, indeed, it was against the evidence at all. The exceptions filed by this claimant itself to the action of the special master in disallowing some items of the account filed by it must also be overruled. I think the items disallowed are not such as the surety in the penal bond undertook to pay.

Perry & Walter: This claim is based upon time checks which divers laborers on the works previous to June 2, 1903, assigned to the claimants. I am inclined to hold and do hold that these claimants may fairly stand in the place of the laborers who assigned the checks. But for the liberty of doing this the laborers would have been subjected to even greater hardship than being compelled to submit to a discount. I think that that discount in no way inured to the benefit of the surety nor discharged its liabilities for the laborers' claims. As these claims appear to have been for labor supplied to Coyne, the exceptions to the allowance of this claim are overruled.

A. S. Cleere: The special master finds that such parts of this claim as were allowed were based upon time checks "given to laborers for labor performed by them for Joseph Coyne upon said work." While the accuracy of this particular finding might possibly have been doubted upon the evidence and exhibits found in the record, no exception based upon that ground has been filed, and we assume the finding to be correct. Indeed, the exceptions themselves assume the finding to be correct, and are based (1) upon the ground that there was some arrangement with Coyne about a discount; and (2) that the discounting was for his benefit. I see no ground for these assertions, and for the reasons indicated in what has been said relative to the claim of Perry & Walter these exceptions are also overruled.

Some exceptions are made to the allowance of interest, but, as the penal bond binds the principal obligor and their surety to pay promptly and in full all claims for labor and materials supplied, I do not see, if that was done, why interest should not be allowed. There is no exception upon the ground that the legal rate of interest in Alabama as applicable to such cases is not 8 per cent. per annum. Consequently all exceptions to the action of the special master in allowing interest upon the various claims of this class and of class 1 will be overruled.

It seems to me, therefore, that the claim in class 1, to wit, that of the Tidewater Coal Company, for $516.23, and the following claims in class 2, to wit: J. M. Wentzell, assignee, for $372.33; Strickland Bros. Machine Company, $176.78; Snow Hardware Company, $218.64; J. E. Baker, $162.55; F. G. Blair, $59.05; Weatherford Printing Company, $22.54; Tidewater Coal Company (in addition), $557.68; Harder Planing Mill & Lumber Company, $157.;

Carolina Portland Cement Company, $1,490.68; R. P. Prowell, $2,025.72; Allen-Jamison Company. $6,146.86; Perry & Walter, $1,047.56; A. S. Cleere, $308.-14; and all of which amount in the aggregate to $13,261.76—were properly allowed by the special master.

Hardaway & Prowell's Claim. 3. We come now to the claim of these parties, the only one in class 3. The general facts will be recalled that with the labor and materials supplied by these claimants neither one of the original contractors had anything to do. True, the United States made no objection, if, indeed, it had any knowledge of the transfer by Coyne to these claimants of the contract of June 2, 1903, and the surety company knew nothing of it until rather late in 1904. That contract, we think, went far beyond anything which we are accustomed to regard as meeting the idea of a subcontractor. The penal bond we may again recall bound the surety to make prompt payment to all persons supplying the labor or materials to the firm of Willard & Cornwell in the prosecution of the work provided for in the contract with the United States. We have construed this clause to mean any one of the firm of Willard & Cornwell, but it does not by any fair construction of the language used bind the surety to pay anything to any one else for supplies furnished to themselves by themselves. This particular claim, if the anomaly is possible, is one due to Hardaway & Prowell from themselves. If any one contracted with respect to the items thereof, it was those parties with themselves, and we think it certainly does not come within the stipulation of the bond. The materials and the labor thus supplied, even if used upon the work, were not in any fair sense supplied to Willard & Cornwell, or to either member of that firm, but were altogether supplied to entirely outside parties by those outside parties themselves. To the certain knowledge of Hardaway & Prowell every remnant of control over the matter had been thrown off by every member of the firm of Willard & Cornwell.

The contract of June 2, 1903, per se, conveyed to Hardaway & Prowell full information that all of the members of the firm of Willard & Cornwell, including Joseph Coyne, had successively abdicated their duties under their contract with the United States, and had turned them over to these claimants. At this point, if Hardaway & Prowell did not know of the existence of the penal bond, of course, they did not contract with any reliance upon it. On the contrary, if they did know of the bond, good faith and every applicable equitable consideration demanded that full notice of the proposed change in the situation should be given the surety—a party most vitally and obviously interested —to the end that it might have the opportunity to agree or to object to this most important change, and take steps to protect itself. Failing to do this, the claimants put themselves in an attitude wholly inconsistent with a just right to claim against the surety, who had been ignored and disregarded at the outset. However, the rights of the surety in this case do not depend upon Hardaway & Prowell's knowledge or their lack of knowledge of the penal bond, and, whether they in fact knew of it or not, the surety, before it could be bound, was entitled to know of the new contract, and to have an opportunity to accept or reject the new arrangement, if it was thereby intended that the surety should come under any obligations respecting that new contract. This right of the surety necessarily resulted from the radically changed situation and the new contract on its face and ultimately under its practical workings showed how immensely and recklessly was increased the cost of the work and the risk of the surety. It cannot be that a right to make a new contract existed whereby the most licentious expenditures could be made and a commission thereon charged to the surety without giving it any opportunity or chance to participate in the making of such an agreement. In short, the surety was not a party to this contract.

Without going at much length into authorities upon general principles of law, which in the main are elementary, we may observe that in United States v. Freel, 186 U. S. 309, 22 Sup. Ct. 875, 46 L. Ed. 1177, it was held that the obligation of a surety does not extend beyond the terms of his undertaking, and when this undertaking is to secure the performance of an existing contract, if any change is made in the requirements of such contracts in matters of substance without his consent, his liability is extinguished. While in that case the contract was changed by the principal parties to it, it cannot fail to

be noticed that in the case before us there was in fact a change of the most substantial character from the situation contemplated by the parties when the penal bond was executed.

In the opening sentence in its opinion in United States v. Allsbury, 4 Wall. (U. S.) 186, 18 L. Ed. 321, the Supreme Court said: "It is unnecessary to refer to authorities to show that the liability of the surety cannot exceed that of his principal." In the case before us no member of the firm of Willard & Cornwell is in anywise bound to Hardaway & Prowell for any part of the demand claimed, and yet it is sought to hold the surety on the penal bond for this claim, although the principals on that bond are manifestly not bound for it, and who, if ever bound, were released by the contract itself. Not only is the principal in the bond released from liability for this claim, if any liability ever existed under the contract of June 2, 1903, but the contention here would extend the liability of the surety entirely beyond any possible liability of his principal, thus in effect making the surety the principal and the only debtor to Hardaway & Prowell.

Upon these grounds it will require a more licentious construction of the penal bond executed in this case than I am willing to give to it to hold an outside party liable for the debt these claimants owe themselves for the labor and material supplied to themselves in a venture in which they embarked with the expectation of making a profit for themselves, and for that purpose alone. It seems to me clear that the surety in the penal bond never agreed that that profit, if any, should be made out of it, nor that any loss would be paid by it, and, while in an appropriate case we might fairly construe the bond to include a subcontractor in the proper sense of that term as having been originally within the contemplation of the parties, we cannot imagine that such an arrangement as that made between the parties to the contract of June 2, 1903, was within the contemplation of the surety when it signed the penal bond. It may be proper to say that probably no court has more often reminded the bar that general expressions in an opinion of the court must be limited to the case in hand than has the Supreme Court of the United States, and I see nothing in the facts in the case of the United States v. American Surety Co. which seems to me fairly to control this phase of this case. But I do note in the opinion in that case a suggestion that upon the facts there shown the court could not see how the surety on the bond could be injured. That remark certainly could not be applied to this case, for, if this surety was ever thought of before the ultimate losses developed (which may well be doubted), there was the most reckless disregard of its interests and rights in the premises, and all, too, without the slightest notice to the surety of what was going on. This general fact shines through the contract of June 2, 1903. It shows through the obviously extravagant expenditures of the claimants and probably in other ways apparent upon the record. We hold, therefore (1) that this claim does not come within the penal bond at all; (2) that the contract and what was done under it greatly changed and increased the actual risk of the surety if in any other view of the case it was bound for what these claimants did after June 2, 1903; (3) the principals in the penal bond were never bound for this claim; and (4) the claim is not, in many respects, satisfactorily proved. But, even if some or all of the labor and materials claimed to have been supplied were put into the lock and dam, they were not supplied to the firm of Willard & Cornwell, nor to any member of that firm, for that purpose, as provided for in the penal bond, but were supplied to Hardaway & Prowell by themselves under their contract of June 2, 1903—a very different proposition. To enforce the latter against the complainant as though it were a party thereto or had notice thereof would be to place the complainant at the mercy of parties it had never heard of under a contract it had never seen, as to prices and quantity of labor and materials, and without the curb that would always have been present in the sense that claimants own interests and their profits depended upon economy and good management, and not even in part upon large expenditures upon which a commission was to be paid. Indeed, there were at least four concurrent conditions upon which the liability of the surety of the penal bond was made to depend by the agreement of the parties. They were (1) that the labor and materials should be supplied; (2) that they should be supplied to Willard & Cornwell; (3) that the

labor and materials so supplied should be used in the work on the lock and dam: and (4) that payment therefor had not been made by Willard & Cornwell. All these must concur. If either was wanting, the surety did not agree to be bound. It is entirely clear that one of the express and most material conditions is absent, to wit, the second one just named, and we are not at liberty to supply it. And it may be repeated that this increase of the surety's risk was clearly outside of any reasonable contemplation of the parties to the penal bond.

I might write more in detail, but this general statement will indicate the grounds upon which I will sustain all of the claimant's exceptions to the claim of Hardaway & Prowell. And the same disposition may be made of their own exceptions to the ruling of the special master upon their claim.

The fund in court: This fund, as before indicated, is $8,176.75. It is made up of certain percentages withheld by the government from time to time out of what would otherwise have been due under the contract. It appears from the record that the whole sum was reserved upon the estimates for work done previous to June 2, 1903, and consequently the surety is entitled to the full benefit of this fund, though Hardaway & Prowell, in my judgment, would have been entitled to any reservation in respect to the work done after June 2, 1903. Section 3468, Revised Statutes of the United States, respecting the rights of sureties, may also support this conclusion of the court, even if the facts in the record do not otherwise make it clear.

Conclusion: It results that the complainant is liable for $13,261.76 on the claims of classes 1 and 2. This sum includes, of course, the $8,176.75, the fund in court. The difference, namely, $5,085.01, and the costs of this action, should be paid into the court by it.

Costs: The agreed order of November 8, 1904, seems to take care of all questions of costs, but if not, they may be provided for when the judgment is prepared. An allowance to the special master for his services should be made, and it should include whatever may be proper to cover expenditures for stenographic work. Counsel may prepare and present a judgment.