**UNITED STATES, to Use of NORFOLK SOUTHERN RAILROAD CO. et al., v. D. L. TAYLOR CO. et al.**

(District Court. E. D. North Carolina, Washington Division.   October 25, 1920.)

1. **Contracts �köm316(4)—Principal and surety �köm129(2)—Permitting subcontractor to do work is consent to subcontract.**

    The contractor and its surety cannot avoid liability to an assignee of subcontractor under a provision that the subcontract should not be sublet without the written consent of the principal contractor, where that contractor knowingly permitted the doing of the work required by subcontractor by one to whom the subcontractor had sublet the contract.

2. **Contracts ⊛147(1)—Construed to ascertain intent of parties in situation.**

    In the construction of contracts the court seeks to ascertain the intention of the parties in view of the purpose to be accomplished, the situation of the parties at the time of its execution, and the subject-matter of the contract.

3. **United States ⊛67(2)—"Construction" of breakwater held to include transporting stone to it.**

    Where the specifications and map for a proposed breakwater, with reference to which a contract for its construction was made, showed that the stone for the breakwater must be secured from distant quarries and transported by rail and barge to the site of the breakwater, the term "construction," as used in the contract, is not confined to the last act of putting the stone in place in the water, but includes the essential steps of getting it to that place, so that services in transporting the stone were protected by the contractor's bond.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Construction.]

4. **United States ⊛67(2)—Dredging for transportation of stone held covered by bond for construction of breakwater.**

    Where it was necessary to dredge a harbor to enable barges to reach a pier where they could be loaded with stone for transportation to the site of the breakwater under construction, the work of such dredging was covered by a bond of the contractor given pursuant to Comp. St. § 6923, which required the contractor to pay all persons supplying labor or materials in prosecution of the work.

⊛For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. United States ⟨⟩67(2)—Bond of contractor for breakwater held to cover charges for barges for transporting stone.**

Where it was necessary that stone for the construction of the breakwater covered by the contract be transported in barges from the railroad to the site, and there were no barges of sufficient size available in the vicinity, charges for the rent of barges from a distant city or their transportation to and from the place of work, and for their repairs while engaged in the work, are covered by the contractor's bond for the payment of those furnishing labor or materials for the prosecution of the work.

**6. Evidence ⟨⟩12—Court takes judicial notice of size of towns.**

The court will take notice of the fact that Beaufort and Morehead City, in North Carolina, are small towns at which it would have been impossible to secure the barges necessary to transport stone for the construction of a breakwater near them.

**7. Assignments ⟨⟩48—Equitable assignment decreed only to effect intention of parties.**

While equity will, on sufficient evidence establishing a clear intention of the parties to make an assignment based on valuable consideration, treat the assignment as made to effectuate the intention of the parties, it will do so only when the evidence of such intention is clear and free from uncertainty.

**8. Mechanics' liens ⟨⟩315—Loan to pay laborer does not establish assignment of wage claimed.**

One who loaned to a subcontractor money with which to pay his workmen, and which was used for that purpose, did not become the assignee of the wage claims paid with that money, so as to be entitled to recover it from the surety of the principal contractor.

**9. Subrogation ⟨⟩26—Doctrine of "subrogation" is not applicable to volunteer payments.**

Equitable subrogation is a legal fiction by which an obligation extinguished by a payment made by a third person is treated as still subsisting for the benefit of the third person, so that by means of it one creditor is substituted to the rights, remedies, and securities of another, but it is not applied in the absence of agreement where the payment is made by a mere volunteer, who is under no legal obligation to make the payment, and who is not compelled to do so for the preservation of any rights or property of his own.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Subrogation.]

**10. Subrogation ⟨⟩26—Loan to pay laborer held volunteer payment.**

One who had rented barges to a subcontractor, the rental for which was secured by the bond of the original contractor, had no financial interest in keeping the subcontractor at work, so that a loan by him to the subcontractor of money to pay wages to prevent the subcontractor from quitting work was a volunteer payment for which he was not entitled to be subrogated to the rights of the workmen paid therewith against the surety of the principal contractor.

**11. United States ⟨⟩67(2)—Contractor completing subcontract not required to pay higher rental for barges.**

One who had rented barges to a subcontractor for use on the contract, and who recovered from the surety on the principal contractor's bond for repair charges and transportation to and from the work, cannot recover for the use of the barges by the principal contractor, after the subcontractor had failed, at a rate of compensation greater than that he was entitled to under his agreement with the subcontractor.

At Law. Action by the United States, to the use of the Norfolk Southern Railroad Company, against the D. L. Taylor Company and

the Fidelity & Deposit Company, in which the Delaware Dredging Company and another intervened. Judgment rendered for interveners against defendant Fidelity & Deposit Company, after claim of the Norfolk Southern Railroad Company was adjusted, and judgment rendered for the amount agreed.

Small, McLean, Bragaw & Rodman, of Washington, N. C., for plaintiff.

Edward R. Baird, Jr., and R. C. Dozier, both of Norfolk, Va., for interveners.

Julius F. Duncan, of Beaufort, N. C., and Manning & Kitchin, of Raleigh, N. C., for defendants.

CONNOR, District Judge. This action was brought by the United States of America for the use of the Norfolk Southern Railroad Company against the defendants D. L. Taylor & Co. and Fidelity Deposit Company of Maryland for the recovery of $22,000, alleged to be due from D. L. Taylor & Co. Jury trial was waived, and stipulation filed that the court find the facts.

Plaintiff alleged that D. L. Taylor & Co. on March 2, 1915, entered into a contract with the United States whereby said company undertook to construct for the United States, in accordance with certain plans and specifications, a breakwater and shore connection at Cape Lookout, N. C.; that, pursuant to the provisions of the statute (section 6923, Comp. St. 1916), the contractors executed a bond in the penal sum of $315,000, with the defendant Fidelity & Deposit Company of Maryland surety, with the condition that said contractors should perform the covenants, conditions, and agreements contained in said contract, and "should promptly make full payment to all persons supplying them labor or materials in the prosecution of the work provided for in said contract." The bond is specifically referred to and made a part of the complaint.

The work provided for by the contract of March 2, 1915, between the United States and D. L. Taylor & Co., was completed by the contractors on or about August 31, 1917, and final payment was made on or about September 14, 1917. This action was brought within the time prescribed by the statute.

The Norfolk Southern Railroad Company, pursuant to the provisions of a contract entered into with D. L. Taylor & Co., hauled large quantities of stone from the quarry near Neverson, N. C., to Morehead City, N. C. Plaintiff alleged that the contractors, D. L. Taylor & Co., were indebted to the said railroad company on account of the price stipulated for said service in the sum of $22,930, for which the railroad company demanded judgment against the bonding company. The Delaware Dredging Company and L. R. Connett intervened and filed claims, to which specific reference will be hereafter made.

The claim of the Norfolk Southern Railroad Company was adjusted and judgment rendered for the amount agreed upon.

*Delaware Dredging Company.*—The Delaware Dredging Company in its intervening petition alleges that Mitchell & Seely made a con-

tract with D. L. Taylor & Co. to dredge a channel from the railroad pier at Morehead City to deep water at Point Lookout, at which place the stone to be used in constructing the breakwater was to be brought on cars to Morehead City, so that the scows could be brought to the pier, and the stone loaded on them and towed to the site of the breakwater. Mitchell & Seely were to furnish the scows for the transportation of the stone. They sublet this contract to the Rickards Dredging Company, which performed the service, and assigned to the Delaware Dredging Company its claim for the amount due therefor.

The Delaware Dredging Company, assignee of the Rickards Dredging Company, filed a claim for removing 18,213 cubic yards of earth which, at the contract price of 18 cents per cubic yard, amounts to $3,278.34. The basis of this claim is that, in the performance of their contract with the United States, D. L. Taylor & Co. were to receive the stone at the quarry at or near a point on the Norfolk Southern Railroad, and convey it in cars to the pier of said company at Morehead City, N. C. It was to be removed from the cars at the pier, placed on scows, and from that point towed to Point Lookout, the site of the breakwater, a distance of about 12 miles, and dumped into the water.

The depth of the water at the pier was not sufficient to permit the scows to be towed to the pier in a position to receive the stone from the railroad cars. To meet this condition and overcome this difficulty, it was necessary to dredge the channel to a depth sufficient to enable the scows to be placed at the pier to receive the stone. While the defendant D. L. Taylor & Co. and the Bonding Company deny such necessity, the evidence amply sustains the allegation in that respect. The dredging was done along the side of the pier to deep water.

After the dredging the scows were taken to the pier, and the stone was loaded on it, and the scows towed to the breakwater. D. L. Taylor was present when the dredging was done. He pointed out the place at which it was done. That was the method adopted by D. L. Taylor & Co. for getting the stone from the railroad pier to the breakwater.

[1] Defendants contend that because of a provision in the contract between Mitchell & Seely and D. L. Taylor & Co. that the contract should not be sublet without the written consent of D. L. Taylor & Co., the intervener Delaware Dredging Company cannot maintain its claim for the dredging. Whatever effect this provision may otherwise have had on the right of the intervener, the evidence shows conclusively that D. L. Taylor & Co. had notice of and knew that the work was being done by the Rickards Dredging Company, the assignors of the Delaware Company, and assented thereto. D. L. Taylor directed the place at which it was to be done, and used the channel after the dredging—unloaded stone on the scows at the pier. When the Rickards Dredging Company demanded payment for the dredging Taylor made no other objection than that Mitchell & Seely had not approved the bill. D. L. Taylor says that "the dredging was necessary in handling the stone from Morehead City. Seely advised us that he was going to have Rickards do the dredging there and we

sent the telegram." The telegram was introduced. It is addressed to John A. Seely at New York. "Please answer immediately, will Rickards do pier dredging." Signed D. L. Taylor & Co. Taylor said it was sent "for the express purpose of rushing the work." Seely had advised Taylor, before the telegram was sent, that he had engaged Rickards Dredging Company to do the work. It is not open to D. L. Taylor & Co., in the light of this evidence, to deny that they consented to the employment of the Rickards Dredging Company. This contention is without merit.

It is next insisted that if Mitchell & Seely had done the dredging, under contract with Taylor & Co., it does not come within the condition of the bond. This is the only serious question raised by the defendants. It is suggested that the work to be done, under the terms of the contract between the United States and D. L. Taylor & Co., was the "construction of the breakwater, including shore connection at Cape Lookout, N. C.," and that this language excludes from the condition of the bond labor and materials performed or furnished in preparing for the construction of the breakwater.

As this contention is directed to other claims made by the interveners, and, if successful, destroys the validity of several of them, it will be well to dispose of it at this time.

[2] An elementary rule invoked in the construction of contracts requires the court to ascertain the intention of the parties, and to do this note must be taken of the purpose to be accomplished, the situation of the parties when they made, and the subject-matter of the contract.

[3] We learn from an examination of the specifications which constituted the basis upon which the contract was made that the government desired to construct a breakwater at Cape Lookout, on the eastern coast of North Carolina, 12 miles east of Beaufort Inlet. The map of the locality was in the office of the United States engineer at Wilmington, N. C., and at the suboffice at Newbern, N. C., "to be examined by prospective bidders." This map shows that Cape Lookout, the site of the proposed breakwater, is about 12 miles from Beaufort, on the Atlantic Coast; that the nearest point on the railroad from which stone of the character and size to be used could be loaded upon barges or scows is at Morehead City, about 2 miles from Beaufort. The breakwater was to be constructed of stone, extending from the high-water line, 2,200 feet, and connecting with the shore. The quantity of stone necessary for the construction of the breakwater was fixed at 1,230,000 tons. It was manifest, and well understood by the parties to the contract, that this quantity of stone, of the character required, could be found or quarried only at some place quite a distance from the work; that it could be placed at the breakwater only by a long haul over a railroad to some point from which it could be carried in barges or scows and towed to the breakwater. That it was to be delivered at the breakwater in vessels or barges is manifest from the Twenty-Seventh section of the specifications, in which the character of the vessels, the manner of weighing in, etc., is specifically

provided. That these conditions were all well understood is further shown by the fact that the quarry from which the stone could be secured was located at or near Neverson, a depot on the Norfolk Southern Railroad, about 120 miles from Morehead City.

In the light of these and other well-understood conditions, it does violence to the language used to confine the word "construction" to the last act in the process, putting the stone in the water, and exclude the essential steps for getting it to the breakwater. The language of the contract which is to be "read into" the condition of the bond has been construed by the Supreme Court in a number of cases, in which it has been sought, without success, to give it a narrow construction.

Reference to a few of these cases will enable us to solve the questions presented by the contentions made by the parties in this case. The latest case is Brogan v. National Surety Co., 246 U. S. 257, 38 Sup. Ct. 250, 62 L. Ed. 703, L. R. A. 1918D, 776, October term, 1917. The contract in that case provided for the deepening of the channel of St. Marys river, Mich. The court notes that the place at which the work was to be done was "in a comparative wilderness at some distance from any settlement. There were no hotels or boarding houses; and the contractor 'was compelled to provide board and lodging for its laborers.'" Supplies were furnished by plaintiff for the laborers and used by them while engaged in the prosecution of the work. He sought to collect the amount due by the contractor from the surety company. The company contended that the words "'in the prosecution of' the work were not used in the bond in their natural sense, but should be given a conventional meaning so as to exclude labor and materials which contribute to construction only indirectly, as do the supplies consumed by a contractor in operating his plant." In that case attention was called to the language of the original act of 1894, which imposed liability upon the surety "to all persons supplying labor and materials in the prosecution of the work," whereas the amended act of 1905 imposed such liability "for labor or materials *used* in the construction or repairs" of the work. Mr. Justice Brandeis, calling attention to decisions in other cases, holding that the change in the language of the statute was immaterial, said:

"This court has repeatedly refused to limit the application of the act to labor and materials directly incorporated into the public work. Thus in Title Guaranty & Trust Company v. Crane Company, 219 U. S. 24, 34, the claims for which recovery was allowed under the bond included not only cartage and towage of material, but also claims for drawings and patterns used by the contractor in making moulds for castings which entered into the construction of the ship. In United States Fidelity Company v. Bartlett, 231 U. S. 237, where the work contracted for was building a breakwater, recovery was allowed for all the labor at a quarry opened fifty miles away. This included, as the record shows, the labor not only of men who stripped the earth to get at the stone and who removed the débris, but carpenters and blacksmiths who repaired the cars in which the stone was carried to the quarry dock for shipment, and who repaired the tracks upon which the cars moved. And the claims allowed included also the wages of stablemen who fed and drove the horses which moved the cars on those tracks.

"In Illinois Surety Company v. John Davis Co., 244 U. S. 376, recovery was allowed not only for the rental of cars, track, and other equipment used by

the contractor in facilitating his work, but also the expense of loading this equipment and the freight paid thereon to transport it to the place where it was used. As shown by these cases, the act and the bonds given under it must be construed liberally for the protection of those who furnish labor or materials in the prosecution of public work."

In the last-cited case Justice Brandeis said:

"The purpose of the act was to provide security for the payment of all persons who provide labor and materials on public work. This was done by giving a claim under the bond in lieu of the lien upon land and buildings customary where property is owned by private persons. Decisions of this court have made it clear that the statute and bonds given under it must be construed liberally in order to effectuate the purpose of Congress declared in the act. In every case which has come before this court, where labor and material were actually furnished for and used in part performance of the work contemplated in the bond, recovery was allowed if the suit was brought within the period prescribed by the act. Technical rules otherwise protecting sureties from liability have never been applied in proceedings under this statute."

The right to recover from the surety is secured to a subcontractor. The learned justice cites a number of cases illustrating the principle upon which the language of the statute should be construed.

[4] It would seem that the undisputed facts in this record bring the claim of the Dredging Company clearly within the language of the statute and the bond, as construed in the cases cited. Whatever negotiations may have been had with the Norfolk Southern Railway Company, prior to the contract with Seely regarding the method of carrying the stone from Beaufort to the breakwater, were abandoned, and the method pursued by Seely was agreed upon and adopted by D. L. Taylor & Co. The dredging was necessary to carry the stone to the breakwater, and was therefore done in the prosecution of its construction and in performance of the work contemplated in the contract.

*L. R. Connett.*—The claims of the intervener L. R. Connett, while based upon the principles applicable to that of the Dredging Company, present more difficulty and will be treated separately. Mitchell & Seely's contract with D. L. Taylor & Co. obligated them to furnish the scows to receive the stone at the pier of the Norfolk Southern Railroad at Morehead City and unload it from the cars to the scows and tow them to the breakwater. For that purpose he rented from intervener L. R. Connett, of New York, four scows. They contracted with Connett to pay for two deck scows $5.50 per day each, for one dumper $8 per day, and for another dumper $10 per day. He files, with his intervening petition, a statement showing the amount claimed for rent to be $4,599.50. See "Statement of Account," sheet 1.

Connett testifies that Mitchell & Seely were to pay a certain price per day, as per statement—different prices for the scows—and was to tow them from New York to the work. They were to bring them back from the work and deliver them back to Connett in New York in substantially the same condition as they took them. They were to supply the captains and make all repairs for which they were liable. Connett introduced four letters, bearing date April 23, 1915, relating to the dumper scow; May 8, 1915, relating to the deck scow No. 12;

May 15, 1915, relating to deck scow No. 11; May 19, 1915, relating to dump scow "L. C. 1," setting out the terms of the charter or rental. The aggregate amount for the rental of the scows is $4,599.50. Connett files an itemized statement of claim for $1,519.01 for amount paid for towing the scows to Morehead City and Norfolk, aggregating, with the rental, $6,118.51.

[5] Passing, for the present, the objection made by defendants to the amount charged, and considering the question of liability of the bond, it would seem, upon the authority of the cases cited, in regard to the claim of the Dredging Company, that this claim is within the condition of the bond.

In United States v. Illinois Surety Co., 226 Fed. 653, 141 C. C. A. 409, it is said:

"It follows, therefore, that all of the claimants who supplied material * * * for the work covered by the contract, either to the original contractor or to the assignee, and whether with or without knowledge of the assignment, were entitled to the full benefit of the bonds, the statutory substitute for a lien, unless, by some act of his own, one or the other claimant may have released or waived or may be estopped from asserting his right."

Applying this rule of construction, the court said:

"The claim of the United States Equipment Company should be allowed. The statute is broader than many of the mechanic's lien acts. It covers not only labor and material that go directly into the completed structure, but all labor and material furnished 'in the prosecution of the work provided for in such contracts.' The work performed by this claimant, through the use of its equipment, was well within the statutory provision."

This ruling was affirmed on appeal in Illinois Surety Company v. John Davis Company, 244 U. S. 376, 37 Sup. Ct. 614, 61 L. Ed. 1206. Referring to this claim, it is said:

"The surety company contends that this was not supplying 'labor and materials.' The equipment was used in the prosecution of the work." Citing Title Guaranty Co. v. Crane Co., 219 U. S. 34, 31 Sup. Ct. 140, 55 L. Ed. 72.

[6] The court will take notice of the fact that Beaufort and Morehead City, the nearest points to the site of the breakwater, are small towns; that it would have been impossible to secure, at either of these towns, scows or barges of the number and character necessary to transport the large quantity of stone to the site of the breakwater.

The principle upon which claims of this character are held to be within the condition of the bond is illustrated in United States Fidelity Co. v. United States, 189 Fed. 339, 111 C. C. A. 73 (C. C. A. 2d Cir.), in which the contract was for the same character of work, constructing a breakwater. Discussing the contention made by the Bonding Company, Judge Noyes said:

"We find nothing in the statute to support the contention made in this case that the bond given in accordance with its provisions covered only the labor performed at the breakwater itself. Had there been a quarry at the shore end of the breakwater, and had the stone been wheeled out from such quarry in wheelbarrows and dumped, it could hardly be claimed that the laborers who got out the stone or hauled it were not engaged in the prosecution of the work. And the fact that a quarry might be fifty miles instead of fifty yards away from the dumping place should make no difference. We think that

the bond in question covered the labor which the contractor was obliged to furnish to fulfill his contract with the government, whether it was performed at the particular place where the stone was finally placed or elsewhere; that the quarrying of the stone, its transportation and dumping, should be regarded as a continuous operation, contributing in its entire progress to the prosecution of the work."

This case was affirmed in United States Fidelity Co. v. Bartlett, 231 U. S. 237, 34 Sup. Ct. 88, 58 L. Ed. 200, Mr. Justice Day saying:

"The object of the contract was to put the stone in place, much of it being merely dropped into the water, with a view to the construction of the breakwater. To accomplish this purpose it was of course necessary to have the material taken from the quarry, using tools and labor for that purpose, and transported to the location of the breakwater and there deposited. This material could not be had * * * at the breakwater."

In City Safe Deposit & Surety Co. v. United States, 147 Fed. 155, 77 C. C. A. 397 (C. C. A. 2d Cir.), the contract provided for the building of a dry dock. The intervener's claim was for coal furnished the contractor used in running locomotives, hoisting engines, and pumping engines in carrying on the work. Judge Lacombe said:

"No specially liberal construction is required to bring the materials supplied in this case within the protection of the act. The labor expended by men in wheeling barrows of material from the point of receipt to the place where it is to be used; in working hand pumps to clear an excavation of water; in turning the cranks of a hoisting derrick, so as to raise materials to a proper elevation—all such labor is manifestly in the prosecution of the work," etc.

It is difficult to make a distinction between these and the instant case. The contractors, D. L. Taylor & Co., as did the representatives of the United States, knew that in the construction of the breakwater it would be necessary to procure the stone at some considerable distance from the work; that it would be necessary to carry it by railroad to Morehead City, and that it would require the use of scows, or vessels for transporting it to the breakwater—they knew the conditions with respect to the geography of the country, and that scows could not be secured at Morehead City. That the use of the scows or vessels for this purpose was known to, and contemplated by, the parties to the contract is beyond the sphere of debate. The amount due Connett for the rental of the scows according to the terms of his contract is clearly within the condition of the bond. Seely concedes the terms of the contract and the amount due Connett according to such terms. The claim thus established is allowed.

I am not inadvertent to, nor have I failed to, examine decisions cited by defendants of an earlier date than those cited herein, in which a more rigid construction is given to language used in bonds of the same character as here than in the later cases. A manifest purpose is disclosed in the latest decisions to give to bonds executed pursuant to the statute, as in this case, a construction which secures to all persons who furnish labor or materials in the prosecution of the work. Defendants rely upon the decision in United States v. Conkling (1905) 135 Fed. 508, 68 C. C. A. 220. This decision does not appear to be

in harmony with those of the Supreme Court cited herein, and which are of controlling authority.

*For Repairs on Account of Damages to Scows. L. R. Connett Preferred a Claim for $1,795.23. See Detailed Statement (Exhibit A, Sheet 2).*—He testifies that, by the terms of his contract leasing or chartering the scows, Seely "was to bring them back from the work and deliver them back to me in New York in substantially the same condition as he took them. He was to supply the captains and make all repairs for which he was liable."

This version of the contract is sustained by the letters in which its terms are set out. Connett testified that scow No. 11 sustained damage while in the possession of Seely, at Morehead City, and that he paid for repairing the damage $1,905.63, for which he introduced and filed vouchers. This damage was covered by insurance to the amount of $1,675, leaving a balance due Connett of $230.63.

Scow No. 12 sustained damage while in Seely's possession for the repairing of which he paid $1,225. He paid for necessary equipment for towing scows to New York, amounting to $339.20, for all of which he filed vouchers. In the statement filed with his petition he credits amount recovered in suit against Taylor, $330, which it is conceded should be credited on another claim (see Statement D), thus leaving the balance due on account of repairs and equipment $1,795.23.

There is no controversy respecting the facts upon which this claim is based. Assuming that the bond is liable for the contract price of the rental of the scows, it would seem that these items come within the terms of the bond. They are clearly due Connett from Seely upon his contract.

*Amounts Paid Wages of the Captains in Control of the Scows while being Towed from Morehead City to New York, as per Statement Filed (Exhibit A, Sheet 3), $194.48.*—Vouchers are filed showing the payment of these amounts. They come within the same rule of construction as the other items paid by reason of Seely's failure to comply with the terms of his contract.

*Expenditures and Partial Repayment of Loans to John A. Seely.*—In regard to these claims Connett says:

"We agreed to help Captain Seely out, Mr. Irons and myself, and Mr. Irons loaned Captain Seely $3,750, and I agreed with Irons that I would stand one-half, and that was to pay Captain Seely's August, 1915, pay roll, which was absolutely necessary to pay in order to have this work go along. The men had to be paid." Question: "I hand you Mr. Irons' assignment of that $1,-074.09 and these checks of yours to Mr. Irons for the aggregate of that sum, $1,074.09. Was that actually advanced by you to pay Mr. Seely's pay roll?" Answer: "It was."

Exhibit 3 is identified by the witness as follows:

"For and in consideration of the sum of one thousand seventy-four and 09/100 dollars ($1,074.09) to me in hand paid, receipt whereof is hereby acknowledged, I do sell, assign, transfer, and set over to L. R. Connett one-half of my claim against John A. Seely or D. L. Taylor and Company, amounting to $2,148.17; the said $2,148.17 being the balance of $3,750.00 loaned to John A. Seely to meet his pay roll on the breakwater contract at Beaufort.

North Carolina, with D. L. Taylor & Company, the said John A. Seely having returned to me $1,601.83 of said amount of $3,750.00.

"Dated at New York City this the 24th day of April, 1916.

"Henry C. Irons.

"Witness: John B. Allen."

In reply to the question why he made the loans, Connett said:

"Well, I was in pretty deep and I didn't want to see Captain Seely go under. I thought he might pull through and pay me."

The claim by Connett for $1,236.72 is based upon the following facts:

Connett, on August 2, 1915, gave to John A. Seely his check on the American Exchange National Bank for $1,250. Irons advanced to Seely the same amount. Seely indorsed the check given by Connett, and delivered it to J. M. Shellabarger, who indorsed it to the Irving National Bank (Exhibit 4).

There is nothing in the record showing in what manner Irons paid or advanced the amount furnished by him to Seely. Checks drawn by the Seely Engineering Company, signed by John A. Seely, president, and W. C. Johnson, treasurer, on the American Exchange Bank, payable to various persons and firms in various amounts, together with vouchers receipted by the persons performing labor or furnishing material to John A. Seely, corresponding with the checks, amounting to $1,630.50, are filed, together with a statement showing payments amounting to $1,042.95, for which no vouchers are filed, aggregating $2,673.43. From a statement filed it appears that these checks were drawn and payments made for pay bills "contracted against the Cape Lookout Breakwater Contract." (Exhibit 8.)

Connett presents a claim for which he contends the contractor's bond is liable for one-half of this amount, $1,236.71. The statement filed (Exhibit 8) shows that this amount was "cash deposited with J. M. Shellabarger, attorney, to be disbursed by him for payment of bills approved by John A. Seely"; but there is nothing in the record showing that Shellabarger drew any checks or otherwise dealt with the money. The vouchers are approved by "W. C. Johnson, Accountant," and receipted as from John A. Seely. The only connection of Shellabarger shown by the papers (Exhibit 8) with the transaction is the open indorsement by John A. Seely, followed by an indorsement by Shellabarger to the Irving National Bank, while the checks are, as stated, drawn by the Seely Engineering Company, by John A. Seely, president, on the American Exchange Bank (see Exhibit 8).

John A. Seely says that he disbursed the funds (Exhibit C), one-half of which Connett supplied—used it to pay these bills, producing the checks. "I owed the pay roll, and I borrowed this money before I sent out my checks. I deposited their checks in my bank, and then drew my checks against that account."

Connett bases his claim against the Surety Company, in respect to these claims, upon the contention that the amounts advanced were so advanced with the understanding with Seely that the amount was to be paid, and was in fact paid, to the laborers engaged in the prosecu-

tion of the work, and for amounts due for materials furnished Seely for the same purpose; that the transaction constituted an equitable assignment to him to the extent of the amounts advanced, and so applied, of the claims or pay rolls of the laborers and the bills of the materialmen.

The Surety Company insists that Connett furnished neither labor nor materials within the meaning of the statute or the condition of the bond, and denies that there was an equitable assignment of the debts to the payment of which the money was applied.

There is no suggestion of any promise or agreement on the part of the laborers, or the materialmen, or of Seely, to assign their debts to Connett and Irons, or either of them; hence the claims of Connett must be sustained, if at all, upon the theory that a court of equity will create an equitable assignment because the money was advanced for the purpose and was in fact used in the payment of debts for which, if not paid, the Surety Company would have been liable.

[7] It is true that a court of equity will, upon sufficient evidence, establishing a clear intention of the parties to make an assignment of a chose in action, based upon a valuable consideration, treat the assignment as made—that is, effectuate the intention of the parties; but the court will do so only when the evidence is clear and free from uncertainty. Pomeroy's Equity (3d Ed.) § 1280.

[8] In Smedley v. Speckman, 157 Fed. 815, 85 C. C. A. 179, (C. C. A. 3d Cir.), Judge Gray says:

"A mere promise, though of the clearest and most solemn kind, to pay a debt out of a particular fund, is not an assignment of the fund, even in equity. To make an equitable assignment, there should be such an actual or constructive appropriation of the subject-matter as to confer a complete and present right in the party meant to be provided for, even where the circumstances do not admit of its immediate exercise. If the holder of the fund retain control over it, it is fatal to the claim of the assignee." Christmas v. Russell, 14 Wall. 69, 20 L. Ed. 762.

In United States Fidelity Co. v. United States, 189 Fed. 339, 111 C. C. A. 71, reported in United States Fidelity Co. v. Bartlett, 231 U. S. 237, 34 Sup. Ct. 88, 58 L. Ed. 200, one Donovan made a contract with the United States for the construction of a breakwater, giving bond containing the statutory conditions, with the United States Fidelity & Guaranty Company as surety. Bartlett, to whose use the suit was brought, furnished supplies to the laborers at the quarry, under an agreement with Donovan that the amount of their monthly accounts should be deducted from the pay roll. At the end of each month the accounts, with such deductions, were submitted to the men and approved by them. The Bonding Company contended that no assignment of the men's wages was shown sufficient to sustain an action at law. Judge Noyes, dealing with this contention, said:

"While the original agreement * * * may have amounted only to an agreement to assign, the act of the laborers after the wages were earned in going over the accounts and in approving the deductions was sufficient, in connection with the original agreement, to amount to a legal assignment."

Justice Day, affirming the ruling, said:

"We think that the testimony discloses that so much of the laborers' wages as were necessary to satisfy Bartlett's advances were assigned to him with their consent, and deductions to that extent made from such wages with their approval in such wise as to consummate the assignment."

In United States v. Rundle, 107 Fed. 227, 46 C. C. A. 251, 52 L. R. A. 505 (C. C. A. 9th Cir.), Rundle entered into a contract with the United States to build a public building, and for the security of the performance of the contract executed a bond conditioned as the statute prescribed, with securities. The Fidelity National Bank advanced the money to Rundle to pay the wages of laborers employed on the work and for materials used in the building, for which suit was brought by the United States to the use of the bank against Rundle and the sureties on the bond. The bank alleged that the laborers and materialmen assigned their claims to it. Rundle made no defense. The sureties denied the assignment of the claims as alleged. The facts were:

An assignment was made by Rundle and the bank that the labor debts should be paid by time checks, and the bank should pay them subject to a small discount. "Nothing was said in any of the conversations concerning an assignment of the claims of the laborers and materialmen, and none of such claims were in fact assigned to the bank except three, which were formally assigned. The time checks for labor were in form certificates that the laborers had worked a designated number of days in a month named at a certain rate per day, stating the amount due, containing upon their face the words, 'Fidelity Bank, please pay,' signed by Rundle. When paid they were indorsed by the payees."

Circuit Judge Gilbert said:

"There is nothing in the circumstances to show an assignment to the bank of any of these time checks for labor, or the orders for the payment of materialmen, or that it was the intention of the bank to take such assignments, or to become substituted to the rights of such payees, * * * nor can it be claimed that the law will raise a presumption of an assignment upon the facts in the case. It is true that an assignment may in some cases be made by parol, and that under certain circumstances the presumption will arise that an assignment was intended solely from the nature of the transaction. But in the circumstances of the present case we discover nothing upon which to rest such a presumption. The agreement was wholly between the contractor and the bank. The laborers and the materialmen were not parties to it. They took their checks and their orders to the bank as directed, and were there paid. The checks and orders were indorsed as evidences of payment, and for no other purpose, and the bank retained them as vouchers. In this there was no assignment. * * * If there was no assignment to the bank of any of the claims save those mentioned in the verdict, there could be for the unassigned claims no liability to the bank upon the bond; for the protection afforded by the bond was to such only as might supply the contractor with labor and materials in the prosecution of his work. It did not extend to a bank which might lend money for the purpose of paying for such work and materials."

In Hardaway & Prowell v. National Surety Co., 150 Fed. 465, 80 C. C. A. 283 (C. C. A. 6th Cir.), plaintiffs advanced money to one who had taken over the performance of the contract. They sought to hold the surety on the bond liable. Judge Lurton said:

"The attitude of Hardaway & Prowell as mere money lenders is not, in substance, changed because that money was used in paying for labor and ma-

terials. Nor is the character of the claim, in its essence, changed by presenting it in the form of an account for the labor and materials which were procured by its application. Manifestly, if the money had been loaned to Coyne, under the express agreement that he was to use it in supplying labor and materials to be used in this work, and it was so used, the debt would still be a debt for money advanced, and not a debt for labor and materials, though every dollar was so applied."

While, upon a rehearing, the facts were, in some respects, modified, and in that condition the case was before the Supreme Court, in 211 U. S. 552, 29 Sup. Ct. 202, 53 L. Ed. 321, the judgment was affirmed. Nothing was said drawing into debate the language used by Judge Lurton, quoted above. Illinois Surety Co. v. Galion (D. C.) 211 Fed. 161, is to the same effect, citing the foregoing decisions. The money advanced by Connett was applied to and discharged the wages of the laborers and others with no suggestion of any assignment by them to Connett, as in the Bartlett Case.

I am unable to find any evidence of an intention on the part of the laborers or materialmen, or of Seely, to assign the pay rolls or bills for material. Connett says that he loaned the money to Seely to help him out, and thought that he would be able to pay him.

Counsel for Connett contends that if there was no equitable assignment of the claims that Connett is entitled to be subrogated to the claim which the persons whose debts were paid had against the Surety Company for their payment, being for labor and materials furnished in the prosecution of the work or the construction of the breakwater. Conceding that the money was advanced to Seely for that purpose, and that it was applied; that if Seely had not paid the laborers or those furnishing the materials, they were entitled to enforce their claims against the Surety Company; that unless Seely had, by breach of his contract or otherwise, forfeited his right, he would be entitled to call upon the Surety Company for payment of the amount due him under the provisions of his contract with D. L. Taylor & Co.—the question arises whether Connett has any equity which entitles him to enforce his claim for the money advanced to Seely against the Surety Company.

It is manifest that Connett has not furnished labor or material for the prosecution of the work. His claims, therefore, if sustained, must be worked out upon the contention that the rights of either the laborers and materialmen, whose claims were paid, or Seely, to whom the loan was made, have vested in him, or that, for the purpose of enforcing the claim against the Surety Company, he stands in their shoes.

[9] This contention renders necessary an examination of the equitable doctrine of subrogation. Sheldon says that it is derived from the civil law, and—

"is said to be a legal fiction, by force of which an obligation extinguished by a payment made by a third person is treated as still subsisting for the benefit of the third person, so that by means of it one creditor is substituted to the rights, remedies, and securities of another. * * * It takes place for the benefit of a person who, being himself a creditor, pays another creditor whose debt is preferred to his by reason of a privilege or mortgage, being obliged

to make the payment, either as standing in the situation of a surety, or that he may remove a prior incumbrance from the property on which he relies to secure his payment. Subrogation, as a matter of right, independently of agreement, takes place only for the benefit of insurers; or of one being himself a creditor, has satisfied the lien of a prior creditor; or for the benefit of a purchaser who has extinguished an incumbrance upon the estate which he has purchased; or of a co-obligor or surety who has paid the debt which ought, in whole or in part, to have been met by another." Sheldon on Subrogation, §§ 2, 3.

"The doctrine of subrogation is not applied for the mere stranger or volunteer who has paid the debt of another, without any assignment or agreement for subrogation, without being under any legal obligation to make the payment, and without being compelled to do so for the preservation of any rights or property of his own."

This definition, with the limitation stated, is generally accepted as correct by the courts, both state and federal. In Sandford v. McLean, 3 Paige (N. Y.) 117, 23 Am. Dec. 773, Chancellor Walworth said:

"It is only in cases where the person advancing money to pay the debt of a third party stands in the situation of a surety, or is compelled to pay it to protect his own rights, that a court of equity substitutes him in the place of the creditor, as a matter of course, without any agreement to that effect. In other cases the demand of a creditor which is paid with the money of a third person, and without any agreement that the security shall be assigned or kept on foot for the benefit of such third person, is absolutely extinguished."

Applying the principle to the instant case, he said:

"If the complainant had actually advanced the money to pay off those judgments, it is doubtful whether he would have been equitably entitled to be substituted in their place without some conventional arrangement to that effect with those creditors."

In Opp v. Ward, 125 Ind. 241, 24 N. E. 974, 21 Am. St. Rep. 220, Mitchell, J., said:

"Subrogation is an equitable device, and rests upon the principles of justice and equity which it is intended to accomplish. The doctrine is well established that one who occupies the attitude of a surety will be subrogated to all the rights, remedies, and securities which the creditor held, in case the former has been compelled to pay a debt which, in equity and good conscience, should have been paid by another. Payment by the surety is equivalent to a purchase from the creditor, and operates as an equitable assignment of the debt, and all its incidents, to the former. * * *

"The application of the doctrine of subrogation requires * * * that in paying the debt the person paying acted under the compulsion of saving himself from loss, and not as a mere volunteer."

The difficulty experienced by the courts is found in applying the doctrine to facts as they are presented in specific cases.

In Nolte & Co. v. Their Creditors, 7 Martin, N. S. (La.) 602, the Supreme Court of Louisiana thus stated the limitation to the persons who were entitled to invoke the equity:

"We are ignorant of any law which gives to the party who furnishes money for the payment of a debt the rights of the creditor who is thus paid. The legal claim alone belongs, not to all who pay a debt, but only to him who, being bound for it, discharges it."

It is held in Bank of Commerce v. Lawrence County Bank, 80 Ark. 197, 96 S. W. 749, 117 Am. St. Rep. 85, 10 Ann. Cas. 211, 10 Am.

& Eng. Cases Anno. 211, that one who advances money to pay the wages of laborers of a corporation who would have had a lien for their wages is not subrogated to the lien of such laborers. 25 R. C. L. 1325; Ætna Life Ins. Co. v. Middleport, 124 U. S. 535, 8 Sup. Ct. 625, 31 L. Ed. 537.

[10] There is no suggestion that Connett was under any legal or other obligation to advance the money to Seely for the purpose of paying the laborers or those who furnished the material. He had no obligation respecting the performance of Seely's contract with D. L. Taylor & Co., or his liability to the laborers or those furnishing material. Conceding this, he contends that, having rented to Seely the scows and dumpers to be used in the prosecution of the work undertaken by him, he was interested in Seely's ability to secure labor and material to operate them; that the payment by Seely of the rental for the scows was dependent upon his success in performing his contract; that finding Seely unable to meet his pay roll, which was necessary to enable him to continue the work, he made the advancement; he "did not want Seely to go under"; he thought that Seely "would pay him."

It will be noted that one is entitled to be substituted or subrogated to the rights of those whose debts they have paid, who has paid the debt of a third person, being compelled to do so "to protect his own rights," or "for the preservation of his own rights."

Does Seely come within this class? It is true that it was to his interest, by reason of having rented the scows and dumper to Seely to be used in the performance of his contract, that Seely should perform his contract with D. L. Taylor & Co., but he had the same right to look to the bond given by Taylor & Co. for the rent of the scows, etc., as Seely and the laborers and materialmen had—they were all, in that respect, on equal footing and had the same security for their debts. The right of those who furnished labor and material in the prosecution of the work of constructing the breakwater to look to the bond was not dependent upon Taylor & Co. completing the work or of Seely's completing his contract with Taylor & Co. In other words, the measure of liability of the surety on the bond is that the contractor "shall perform the covenants, conditions, and agreements contained in said contract, and make prompt payment to all persons supplying them labor or materials in the work provided for in said contract." The purpose of the bond is primarily to secure the United States in the performance of the contract, and secondarily the payment of all persons supplying the contractor labor and material, etc. Hill v. Am. Surety Co., 200 U. S. 197, 26 Sup. Ct. 168, 50 L. Ed. 437. Of course, persons coming within the terms and conditions of the bond must establish their claims by showing either an express contract with the contractor, or the furnishing of labor and material upon an implied contract to pay the value thereof. Having met these conditions, the liability of the bond is clear. It is upon this basis that Connett is entitled to look to the bond for payment of the rental of his scows and dumps.

It follows, therefore, that it was entirely immaterial, in a financial

sense, to Connett whether Seely paid his laborers and those who furnished material or not. His rights against the bond were not changed or affected by Seely's failure to pay the laborers, nor was he compelled to advance the money to protect or preserve his remedies or security. It is manifest from his evidence that, when he advanced the money, he had no thought of looking to the bond for payment. He says: "I was in pretty deep water, and I did not want to see Captain Seely go under. I thought he might pull through and pay me."

The facts bring the case within the decision in United States v. Rundle, supra, in which Judge Gilbert says:

"If there was no assignment to the bank of any of the claims, * * * there could be for the unassigned claims no liability to the bank upon the bond; for the protection afforded by the bond was to such only as might supply the contractor with labor and materials in the prosecution of his work. It did not extend to a bank which might lend money for the purpose of paying for such work and materials."

In the absence of an assignment of the claims discharged by the loans made by Connett and Irons, the former is not entitled to be subrogated to their claims against the bond. These two claims are not allowed.

[11] *Hire of Scows when Seized by Taylor.*—This claim for $591 is based upon undisputed facts. Seely having failed to complete his contract, D. L. Taylor & Co. took possession of the scows and dumper rented by Connett to Seely and used them in the further prosecution of the work; dumper No. 1, 11 days; dumper No. 24, 13 days; and deck scow No. 12, 12 days.

Connett had rented these dumpers and scows to Seely at a price per day which, for the number of days during which they were used by Taylor & Co., would have amounted to $284. He explains this charge by saying that Seely was to use them for a long period of time and was to return them in good condition at his own cost. He also says that they would have yielded him a much larger rental in New York.

It is clear, however, that if Seely had continued the work under his contract, he would have used the dumpers and scow for the same period of time which Taylor & Co. did. I am unable to see why Connett should, in fairness, be entitled to charge them double the price per day which he had contracted to receive from Seely. He has received in the allowance of the charge for amount paid for repairs $330.10, compensation for injury sustained in that respect. This claim is allowed for $284, being the same price which he would have received from Seely under his contract.

Judgment will be signed that the Delaware Dredging Company, as assignee of the Rickards Dredging Company, recover of the defendant Fidelity & Deposit Company of Maryland for $3,278.34; that L. R. Connett recover of the defendant Fidelity & Deposit Company $8,392.22; that interest be calculated from the date of the summons in this action, July 8, 1918; that plaintiffs recover their cost, to be taxed by the clerk. Judgment will be signed accordingly.