**UNITED STATES of America, for the use of CTI LIMITED, INC., Assignee of Lockwood Glass Company, CTI Limited, Inc., and Carl Seyfer, Plaintiffs,**

v.

**MELLON STUART COMPANY, a Corp., St. Paul Fire and Marine Insurance Co., Seaboard Surety Company and Federal Street Construction Company, a Corp., Defendants.**

**UNITED STATES of America, for the use of G & 1 ASSOCIATES, INC. and Midwest Industrial Sidings, Plaintiffs,**

v.

**FEDERAL STREET CONSTRUCTION CO., INC., a Pennsylvania Corporation, etc., et al., Defendants.**

Nos. 92 C 1845, 92 C 2057.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 1, 1994.

---

Donald Vincent O'Brien, O'Brien, O'Rourke, Hogan & McNulty, Kathleen Ann O'Dekirk, Garfield & Merel, Ltd., Chicago, IL, for CTI Ltd., Inc., Carl Seyfer.

Donald Paul Smith, Chicago, IL, for G & 1 Associates, Inc., Midwest Indus. Siding, Inc.

Christopher James Murdoch, Burke, Weaver & Prell, John S. Mrowiec, Stein, Ray & Conway, Chicago, IL, for Mellon Stuart Co., Seaboard Sur. Co.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiffs, United States *ex rel.* CTI Limited, Inc. ("CTI"), and Carl Seyfer ("Seyfer"), sue for payment from a payment bond issued by defendant, Seaboard Surety Company ("Seaboard"), on behalf of Mellon Stuart Company, now known as Federal Street Construction Company ("Mellon Stuart"), pursuant to the Miller Act, 40 U.S.C. § 270a–270d (1988) (the "Act"). Seaboard moves for summary judgment.

### BACKGROUND

In September, 1989, Mellon Stuart contracted with the United States Postal Service to become the general contractor on the construction of a postal processing center. Sea-board's Rule 12(M) Statement of Material Facts ("Defendant's Facts"), ¶ 1. Mellon Stuart subcontracted with Lockwood Glass Company ("Lockwood") on December 7, 1989, to perform glazing, porcelain, and roofing work on the postal center project. *Id.* at ¶¶ 2, 3.

The Lockwood subcontract required Lockwood to post a performance bond. *Id.* at ¶ 4. Seyfer satisfied that requirement for Lockwood by guarantying a $75,000 Irrevocable Letter of Credit established by First of America Bank–Dekalb in Mellon Stuart's favor. *Id.;* Complaint Exhibit 5. Mellon Stuart was entitled to draw on the Letter of Credit in the event of Lockwood's default. Complaint Exhibit 5. In order "to provide protection to Seyfer," Mellon Stuart, Lockwood, and Seyfer subsequently entered into an Agreement (hereinafter referred to as "the Tri–Party Agreement") on December 13, 1989, which provided in pertinent part as follows:

(1) In the event that Lockwood is determined by Mellon Stuart to be in default under the terms and conditions of its contract dated December 7, 1989, with Mellon Stuart[,] Mellon Stuart, Seyfer and Lockwood acknowledge that Seyfer may assume and take control of the obligations and duties of Lockwood under its contract with Mellon Stuart, including but not limited to the right to complete the remainder of Lockwood's subcontract with Mellon Stuart. Nothing herein shall be construed to require Seyfer to so assume any of the duties or responsibilities or liabilities of Lockwood under its contract with Mellon Stuart.

Tri–Party Agreement, Complaint Exhibit 3.

Lockwood failed to complete the job as required, causing Mellon to declare a default. Defendant's Facts, ¶ 7. Seyfer, in turn, exercised his right under the Tri–Party Agreement to complete performance of the Lockwood subcontract rather than forfeit his $75,-000.00 Letter of Credit. In a September 3, 1991 agreement titled "Letter of Understanding," Mellon Stuart and Seyfer agreed, in pertinent part, as follows:

Carl H. Seyfer will undertake the completion of the glazing subcontract on the subject job as a result of Lockwood Glass Company's default. The monies remaining to be paid on the Lockwood Glass Company Contract plus an additional $75,000.00 from Carl H. Seyfer will be used to pay for this work....

Carl H. Seyfer will complete all of the duties and obligations of the contract in full cooperation with [Mellon Stuart]. All actions will be carried out after having been reviewed and approved by [Mellon Stuart]. Further, it is understood that Carl H. Seyfer will subcontract to others all of this work and is not licensed to do any of the work as an individual. In this regard CTI Ltd. a Chicago glazing contractor has been hired to do the on site tasks.

Letter of Understanding, Complaint Exhibit 4.

Seyfer and CTI forwarded invoices to Mellon itemizing the work performed and the payment expected for the services rendered. Plaintiff's Additional Statements of Fact Pursuant to Rule 12(N) ("Plaintiff's Facts"), ¶ 4. Seyfer and CTI allege that after crediting Mellon with payments made to date for the work performed by Lockwood and CTI, a balance of $26,564.26 due to Seyfer and CTI remains for the work performed. *Id.* at ¶ 5. They sue to recover the unpaid invoices from the Miller Act payment bond posted by Seaboard. Seaboard moves for summary judgment contending that because Seyfer was merely Lockwood's guarantor, not a "subcontractor," neither Seyfer nor CTI can make claims against the Miller Act bond.

### DISCUSSION

*Summary Judgment Standards*

A movant is entitled to summary judgment when the moving papers and affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celo-*

*tex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and draw all inferences in the nonmovant's favor, *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990).

There are no significant disputed issues of material fact in this case. Rather, Seaboard's motion for summary judgment calls upon the court to interpret the Miller Act and determine whether the plaintiffs fall within the scope of the Act's protection.

*The Miller Act*

■ The Miller Act requires a contractor on a federal construction project, where the contract amount exceeds $25,000, to furnish, among other things, a payment bond "for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract." 40 U.S.C. § 270a(a)(2). By statute, the surety's payment bond runs to the benefit of the United States, and subcontractors may sue the surety on the bond in federal court in the name of the United States. 40 U.S.C. § 270b(b).[1] However, the Supreme Court has held that the scope of the Act's protection is not boundless: A direct contractual relationship with either the prime contractor or a subcontractor is a prerequisite to recovery under the Act. *J.W. Bateson Co. v. U.S. ex rel. Bd. of Trustees,* 434 U.S. 586, 589–90, 98 S.Ct. 873, 875–76, 55 L.Ed.2d 50 (1978); *Clifford F. MacEvoy Co. v. United States ex rel. Tomkins Co.,* 322 U.S. 102, 109–111, 64 S.Ct. 890, 894–95, 88 L.Ed. 1163 (1944). Those in more remote relationships are not protected.

---

**1.** Subcontractors on private construction projects ordinarily can assert a mechanics' lien on the property involved to secure payment. Because mechanics' liens cannot attach to federal property, the Miller Act's payment bond require-

ment was designed to provide equivalent protection. *See F.D. Rich Co. v. U.S. ex rel. Indus. Lumber Co.,* 417 U.S. 116, 122, 94 S.Ct. 2157, 2161, 40 L.Ed.2d 703 (1974).

Seaboard contends that Seyfer is nothing more than a subcontractor's guarantor and thus stands in too remote a position *vis-a-vis* Mellon Stuart to be entitled to Miller Act protection. Thus, the instant case presents what appears to be a question of first impression; namely, whether a performing guarantor who exercises its option to assume the duties and obligations of its defaulting subcontractor and completes the subcontractor's work on the construction project, can be considered a "subcontractor" entitled to the Act's protection. We hold that it can.

■ Under the Act, the relationship among parties to a federal construction contract must be decided by federal law. *United States ex rel. Gold Bond Bldg. Prods. v. Blake Constr. Co.*, 820 F.2d 139, 141 (5th Cir.1987). The Act is "highly remedial" and therefore "entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects." *MacEvoy*, 322 U.S. at 107, 64 S.Ct. at 893.

■ In *MacEvoy*, the Supreme Court "adopted a functional rather than a technical definition for the term subcontractor," *F.D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 123, 94 S.Ct. 2157, 2162, 40 L.Ed.2d 703 (1974), and noted that, for purposes of the Act, a subcontractor is "one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract." 322 U.S. at 109, 64 S.Ct. at 894. In *Rich*, the Court repeated *MacEvoy*'s definition, and added that it is proper, when determining whether an entity is a subcontractor, to look to "the substantiality and importance of [its] relationship with the prime contractor." 417 U.S. at 123, 94 S.Ct. at 2162. In *J.W. Bateson Co. v. U.S. ex rel. Bd. of Trustees*, 434 U.S. 586, 98 S.Ct. 873, 55 L.Ed.2d 50 (1978), the Court indicated that the approach of looking to "functional" considerations such as the substantiality and importance of the relationship between the parties is particularly appropriate where a direct contractual relationship with the prime contractor is involved. *See id.* at 593–94, 98 S.Ct. at 877.

We have no hesitation in finding that a contractual relationship existed between Mellon Stuart and Seyfer. The Tri–Party Agreement, entered into by Mellon Stuart, Seyfer, and Lockwood, for the explicit purpose of providing protection to Seyfer, expressly granted Seyfer the option of "assum[ing] and tak[ing] control of the obligations and duties of Lockwood under its contract with Mellon Stuart, including but not limited to the right to complete the remainder of Lockwood's subcontract with Mellon Stuart." Upon Lockwood's default, Seyfer exercised this option. Subsequently, in the Letter of Understanding, Mellon Stuart and Seyfer memorialized their agreement that Seyfer would assume the obligations and duties of the Lockwood subcontract as was his right under the Tri–Party Agreement. Indeed, in a previous order, this court[2] determined that the Letter of Understanding unambiguously contractually bound Seyfer to complete " 'All duties and responsibilities' of the Subcontract entered into by Lockwood." *United States ex rel. CTI Ltd., Inc. v. Mellon Stuart Co.*, No. 92 C 1845, 1994 WL 22978 at *2 (N.D.Ill. Jan. 26, 1994). As was noted in that opinion, "Seyfer was not bound to make such an election under the Tri–Party Agreement, but once he did elect, he could not reverse his decision, for he received consideration from Mellon Stuart, forbearance on the letter of credit, for that election." *Id.* 1994 WL 22978 at *3. Accordingly, Seaboard cannot contend that no contractual relationship existed between Mellon Stuart and Seyfer.

Well aware of the contractual relationship between Mellon Stuart and Seyfer, Seaboard argues that neither the Letter of Understanding nor the Tri–Party Agreement is a Miller Act subcontract. Seaboard argues, for example, that "the Letter of Understanding instead defined how Mellon Stuart and Seyfer would proceed to liquidate Seyfer's guarantee obligations." Seaboard's Reply in Support of its Motion For Summary Judgment at 4.

2. This case was originally assigned to Judge Nordberg's calendar. By order of the Executive Committee, it was reassigned to this court's calendar effective May 25, 1994.

Seaboard exalts form over substance here and ignores the commercial reality that the Tri–Party Agreement, upon which the Letter of Understanding is predicated, was a separately negotiated contract entered into by and between the three parties. That this Agreement may have purported, as Seaboard suggests, to define Seyfer's obligations as Lockwood's guarantor does not negate the fact that the Agreement provided Seyfer with the newly created option of stepping into Lockwood's shoes as Mellon Stuart's subcontractor. The Miller Act "looks to the protection of those who supply the labor or materials provided for in the contract, and not to the particular contract or engagement under which the labor or materials were supplied." *Hill v. American Surety Co.,* 200 U.S. 197, 205, 26 S.Ct. 168, 171, 50 L.Ed. 437 (1906).

Mellon Stuart, through its own contractual arrangement with Seyfer, opened the door for Seyfer to assume the position of subcontractor. We find no sound reason in law or logic to conclude that Seyfer is foreclosed from being afforded subcontractor status merely because he assumed the obligations and duties of the Lockwood subcontract and undertook the completion of the glazing subcontract as a means of avoiding forfeiture of his $75,000 Letter of Credit.

Examination of the substantiality and importance of the relationship between Mellon Stuart and Seyfer lends further support to our conclusion. Indeed, we find that the relationship between Mellon Stuart and Seyfer is, in all material respects, indistinguishable from that between Mellon Stuart and Lockwood—and, of course, there can be no dispute that Lockwood was a subcontractor. Seyfer assumed all of the obligations and duties of the Lockwood subcontract and he was to complete these obligations and duties in full cooperation with Mellon Stuart. Indeed, under the Letter of Understanding, all of Seyfer's actions were to be "carried out after having been reviewed and approved by [Mellon Stuart]." Plainly, Mellon Stuart envisioned that its relationship with Seyfer would be substantial and important.

Moreover, it is important to bear in mind that not only did Mellon Stuart contract directly with Seyfer providing him the option of stepping into Lockwood's shoes, but also Mellon Stuart initially approved Seyfer to be Lockwood's guarantor. The Lockwood subcontract explicitly provided that Lockwood was to provide performance and payment bonds "from such Surety or Sureties ... satisfactory to Contractor and Owner." These are important considerations in determining whether Seyfer should be considered a remote stranger to Mellon Stuart who falls outside of the scope of Miller Act protection. In *MacEvoy,* the Supreme Court explained one of the "practical considerations" underlying the limitation on the scope of Miller Act protection as follows:

> Congress cannot be presumed, in the absence of express statutory language, to have intended to impose liability on the payment bond in situations where it is difficult or impossible for the prime contractor to protect himself. The relatively few subcontractors who perform part of the original contract represent in a sense the prime contractor and are well known to him. It is easy for the prime contractor to secure himself against loss by requiring the subcontractors to give security by bond, or otherwise, for the payment of those who contract directly with subcontractors. But this method of protection is generally inadequate to cope with remote and undeterminable liabilities incurred by an ordinary materialman, who may be a manufacturer, a wholesaler or a retailer. To impose unlimited liability under the payment bond to those sub-materialman and laborers is to create precarious and perilous risk on the prime contractor and his surety.

322 U.S. at 110–11, 64 S.Ct. at 895. As a practical matter, Mellon Stuart easily could have protected itself by requiring Seyfer to post a payment bond—as a condition to his assuming the Lockwood subcontract—just as it requires of all of its other subcontractors. In view of the facts that Mellon Stuart approved Seyfer as Lockwood's guarantor in the first instance, subsequently entered into an agreement with Seyfer, and easily could have required Seyfer to post a payment bond, we decline to hold that Seyfer stands

in too remote a position to Mellon Stuart to fall under the Miller Act's protection.

The cases Seaboard cites for the proposition that the Miller Act does not protect guarantors of a subcontractor are factually distinguishable from the instant case and hence do not compel a contrary conclusion. In *United States ex rel. Gold Bond Bldg. Prods. v. Blake Constr. Co.*, 820 F.2d 139 (5th Cir.1987), a remote supplier of materials, who had contracted to provide materials to a subsidiary of a subcontractor, which in turn sold the materials to the subcontractor, required a payment guarantee from the subcontractor. *Id.* at 140, 141. When the unpaid supplier sought to recover under the prime contractor's Miller Act bond, the Fifth Circuit held that the subcontractor's guaranty agreement did not create the kind of "direct contractual relationship" with the subcontractor that would entitle the supplier to Miller Act protection because it was "not a contract to furnish material or labor under the Miller Act." *Id.* at 142. Seaboard seizes upon the Fifth Circuit's statement that "the Miller Act ... does not provide a right of action for those who have a guaranty agreement with the contractor or subcontractor." *Id.* at 142. However, despite this *dicta, Gold Bond*'s holding is simply that a guaranty agreement issued by a subcontractor to a materialman on behalf of a sub-subcontractor does not establish the requisite relationship between the materialman and the subcontractor to entitle the former to Miller Act protection. Neither the facts nor the holding have any bearing on the instant case.

Moreover, the broad language just quoted has no applicability where the guarantor, like Seyfer, enters into a separate and distinct contract with the principal to supply labor and materials necessary to complete the work begun by a defaulting subcontractor. The Fifth Circuit's full statement was: "On its face, the Miller Act provides a right of action only for those who have a contract to furnish labor or material to the contractor or subcontractor; it does not provide a right of action for those who have a guaranty agreement with the contractor or subcontractor." *Id.* at 142. Seyfer, who contracted with the general contractor to provide labor and material, falls squarely within the Act's protec-

tion. Nothing in *Gold Bond* or the language of the Act precludes this finding.

Seaboard looks to *Hardaway v. National Surety Co.*, 211 U.S. 552, 29 S.Ct. 202, 53 L.Ed. 321 (1909), for the proposition that "a guarantor or surety who undertakes to perform a defaulting principal's obligations and who looks only to the balances remaining in his principal's contract (by failing to reserve rights) cannot claim under a payment bond." Seaboard's Reply at 4. Wholly apart from the fact that *Hardaway* did not involve a guarantor or surety undertaking to perform a defaulting principal's obligations—and hence is readily distinguishable from the instant case—Seaboard completely misapprehends *Hardaway*'s holding.

In *Hardaway*, the original contractor on a federal construction contract entered into a contract with one, Coyne, whereby Coyne agreed to assume the debts of the contractor, carry on the performance of the contract, and make all future purchases in Coyne's own name. In return, Coyne was to receive all profits from the contract. 211 U.S. at 554, 555, 29 S.Ct. at 202, 203. When Coyne became financially unable to complete the work, he contracted with the claimants to furnish superintendence and financing for the completion of the project. *Id.* at 556, 29 S.Ct. at 203. In return, Coyne agreed to endorse over to the claimants all future government payments on the contract and to assign to the claimants his interest in certain funds already earned on the contract but retained by the government to secure future performance. *Id.* at 557–58, 29 S.Ct. at 204. Due to certain circumstances relating to the nature of the work, the claimants expended "a sum of about $36,000 in excess of the moneys collected by them from the government according to the terms of their agreement with Coyne." *Hardaway & Prowell v. National Surety Co.*, 150 F. 465, 468 (6th Cir.1907), *aff'd*, 211 U.S. 552, 29 S.Ct. 202, 53 L.Ed. 321 (1909). The claimants sought to recover this amount from the prime contractor's surety bond. *Id.*

The Sixth Circuit denied recovery, and the Supreme Court affirmed, finding that the claimants were not subcontractors. In par-

ticular, the Sixth Circuit found that the claimants had not supplied labor or materials in the prosecution of the work; but rather, were "mere lenders of money." 150 F. at 470. The court's reasoning is instructive; so, we quote at length:

It is true that ... [claimants] are to "take up said work and complete it," but the way in which they are to do this is ... first, to superintend the construction of the work; second, they agree to put in a competent superintendent; third, to reorganize Coyne's demoralized labor force. *These are all things consistent with a mere superintendence or management in the interest of Coyne.* The next, and last stipulation, is of most moment. It is that "they will furnish the necessary finances for the completion thereof." Now, if [claimants] are to go on as mere subcontractors and finish the work, supplying the necessary labor and materials, and receiving an agreed consideration for the work, why this explicit agreement to furnish necessary finances to complete the work? *Especially is this significant in view of the fact that there is no agreement that they shall supply the necessary labor and materials to finish the work.* If, as contended, there is an implied agreement to reimburse every outlay by [claimants] in completing this work, is it more than an implied agreement to repay the money advanced under this contract to "furnish the necessary finances" to complete the job? *In short, is not the agreement one by which the appellants are to supply the money and superintend its expenditure, this supervision enabling them to protect themselves against diversion?*

*Id.* (emphasis added).[3] The Supreme Court affirmed, finding that it could not reach the conclusion that the claimants were subcontractors furnishing labor or materials. 211 U.S. at 559, 29 S.Ct. at 204. The Court noted that

[a]s we read this contract, [the claimants], in view of Coyne's financial and other difficulties, undertook to do certain things in relation thereto. They undertook to supe-

rintend the completion of the [project], and, *to that end, to furnish the necessary finances for the completion of the work.*

*Id.* (emphasis added).

Although the point need not be belabored, we find that Seyfer's position is entirely different from that of the claimants in *Hardaway.* Once he opted to step into Lockwood's shoes and assume the completion of the project, Seyfer ceased being merely a guarantor. The claimants in *Hardaway* were at all relevant times nothing more than financiers and agents acting on behalf of Coyne. Once he assumed the completion of the postal project, Seyfer was no one's financier and acted on behalf of no one but himself. Moreover, unlike the *Hardaway* claimants who, at most, superintended Coyne's labor force, Seyfer actually hired his own labor force for the completion of the work and this was explicitly envisioned in the Letter of Understanding wherein it is stated that "Seyfer will *subcontract* to others all of this work and is not licensed to do any of the work as an individual. In this regard CTI Ltd. a Chicago glazing contractor has been hired to do the on site tasks." Seyfer was further obliged—to the extent that he assumed all of Lockwood's duties and obligations—to provide the required materials for the project. As noted above, the Sixth Circuit specifically identified the fact that the *Hardaway* claimants had no specific agreement to hire the necessary labor or supply materials as support for its finding that they were nothing more than Coyne's financiers and agents. Accordingly, *Hardaway* is inapposite to the instant case.

Finally, Seaboard misunderstands the significance in *Hardaway* of the discussion pertaining to the fact that the claimants' right to payment was limited to the balances remaining to be earned on the government contract plus the previously earned, but retained, funds held for security by the government. Seaboard misconstrues this discussion to stand for the general proposition that where a claimant's right to payment is limited to such balances, the claimant can not recover

---

**3.** The Sixth Circuit found further support for its holding that the claimants were mere financiers in the recitals of the Coyne contract wherein it is

provided that the construction project "was still uncompleted on account of his inability to procure the necessary financial aid." 150 F. at 470.

on the Miller Act bond. *See* Seaboard's Reply at 5 n. 4. This is incorrect. The Sixth Circuit determined that the *Hardaway* claimants had been paid all they were entitled to under their contract with Coyne and *for that reason* could not seek additional payment from the Miller Act surety. The court stated:

> [Assuming that the claimants could be considered subcontractors], they are only such for a fixed price, being the two funds earned by completion.... If they suffered unexpected losses, they must bear them. *The price for which they agreed to do the work has been paid them, and they may not recover against the surety what they could not recover against the principal obligor.*

*Hardaway & Prowell,* 150 F. at 472 (emphasis added).[4] Plainly, assuming for the sake of argument that they were otherwise considered proper claimants, if they had not been paid that which they were due under the Coyne contract—even if the promised contractual amount was limited to the balances due under the government contract—the claimants could have sought recovery from the surety. *See id.* at 472–73. The Supreme Court's discussion merely affirmed the Sixth Circuit in this regard and implies only that a claim against a Miller Act surety will not stand where it seeks payment beyond that which the principal was bound to pay. *See Hardaway,* 211 U.S. at 561, 29 S.Ct. at 205.

For all of the foregoing reasons, we find that Seyfer is properly considered a "subcontractor" entitled to Miller Act protection. Therefore, Seaboard's motion for summary judgment is denied.

### CONCLUSION

Defendant Seaboard Surety Company's motion for summary judgment [51–1] is denied. This case is set for status on September 2, 1994 at 10:00 a.m. for the determination of a firm trial date in September.

---

4. On petition for rehearing, the Sixth Circuit acknowledged that, in fact, some of the money due to the claimants under the Coyne contract had not been paid to them. Nevertheless, the court found that the claimants were not entitled to recover this money from the surety because, under the circumstances of that case, the surety was equitably subrogated to those funds and used them to pay certain of the principal's debts on the government construction project which predated the claimants' claims. Moreover, since the claimants were not subcontractors they could make no claim against the surety. *Hardaway & Prowell,* 150 F. at 472–73.